## MEDICAL SOCIETY OF SOUTH CAROLINA v. GILBRETH.

(District Court, D. South Carolina, at Charleston.  November 3, 1913.)

1. CONTRACTS (§ 164*)—CONSTRUCTION—PROPOSAL AND LETTERS.

A medical society, having $100,000 constituting a trust fund with which to construct a hospital, advertised for bids on certain plans and specifications. Defendant, a foreign contractor, sought to obtain a contract for the work on his special "cost plus fixed sum" plan; but, complainant being unable to make such a contract, defendant's agent agreed to make a bona fide lump sum bid, and filed a "revised proposal" on one of the architect's blanks, which was a complete and inclusive proposition to furnish all the labor and materials of every description for $109,375. With this he wrote a letter to the chairman of complainant's building committee, referring to a guaranty of completion within the time specified, and offering to give a bond, if required, and then stated that in giving the completion date defendant expected complainant to close the contract "on our special method of construction," which allows speed work, and that such method of construction insured speed beyond question. *Held,* that such letter, though construed in connection with the proposal, did not change the latter from a bid for a lump sum to one on defendant's special "cost plus fixed sum" plan.

[Ed. Note.—For other cases, see Contracts, Cent. Dig. §§ 746–748; Dec. Dig. § 164.*]

2. REFORMATION OF INSTRUMENTS (§ 16*)—MISTAKE.

Where a written contract is drawn and executed that professes or is intended to carry into execution an agreement previously made, in writing or by parol, but by mistake of the draftsman, either as to fact or law, the contract as written does not fulfill or violates the manifest in-

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

tention of the parties, equity will grant reformation so as to conform the writing to the agreement.

[Ed. Note.—For other cases, see Reformation of Instruments, Cent. Dig. § 68; Dec. Dig. § 16.*]

**3.** REFORMATION OF INSTRUMENTS (§ 16*) — BUILDING CONTRACT — OFFER AND ACCEPTANCE—MISTAKE.

Appellant, having a trust fund with which to construct a hospital, procured plans and advertised for bids. Defendant's agent attempted to obtain the contract on defendant's special "cost plus fixed sum" plan, but on numerous occasions was informed that complainant had no power to enter into a contract on that basis, whereupon he filed a lump sum bid to do the work, for $109,375. After the bids had been opened, defendant's agent was informed that his bid had been accepted, whereupon he produced a written contract, which he desired to have executed at once. This was taken to complainant's attorney and, after a cursory examination and some slight additions, was executed, and it was not until after it was discovered that the buildings were costing defendant much more than his bid that it was found that the contract contained a clause which converted it from a lump sum contract into one binding complainant to pay the actual cost of the work, plus $10,000. *Held,* that the contract between the parties was complete on the oral acceptance of defendant's "lump sum" bid, and that the written contract, executed as a memorial thereof, was subject to reformation, either because of mutual mistake or the mistake of complainant and fraud of defendant's agent.

[Ed. Note.—For other cases, see Reformation of Instruments, Cent. Dig. § 68; Dec. Dig. § 16.*]

**4.** EQUITY (§ 7*)—JURISDICTION—MISTAKE OF LAW—FRAUD.

A mistake of law by both parties to a contract, or by one party, induced or brought about by such conduct of the other as makes it inequitable on his part to take advantage thereof, is remedial in a court of equity.

[Ed. Note.—For other cases, see Equity, Cent. Dig. §§ 15, 16; Dec. Dig. § 7.*]

**5.** REFORMATION OF INSTRUMENTS (§ 23*) — WRITTEN CONTRACT — MISTAKE — RIGHT TO RELIEF.

Defendant's lump sum bid for the construction of certain buildings for complainant for $109,375 having been accepted, defendant's agent procured the execution of an instrument which changed the contract to one obligating complainant to pay the cost plus $10,000. This was not discovered until it was ascertained that the buildings were going to cost defendant much more than his bid, when, for the first time, he claimed that complainant was liable for the cost plus $10,000. When this was denied, he abandoned the work, and complainant completed it at a cost of $12,000, and liens had been filed to the amount of $7,000, and suits brought for their enforcement, after which defendant instituted an action at law for the recovery of a large amount alleged to be due for materials furnished in the construction of the building, and complainant claimed that it had expended a sum in completing the building which it sought to recover from defendant. *Held,* that the completion of the work did not bar complainant's right, under such circumstances, to a reformation of the instrument for mistake.

[Ed. Note.—For other cases, see Reformation of Instruments, Cent. Dig. § 82; Dec. Dig. § 23.*]

**6.** COURTS (§ 347*)—FEDERAL COURTS—PRACTICE—EQUITY RULES.

Under Equity Rule 19 (33 Sup. Ct. xxii), providing that the court at every stage of the proceeding must disregard any error or defect in the procedure which does not affect the substantial rights of the parties, if

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

a bill can be viewed in more than one aspect, the courts will adopt that view which best justifies the relief to which complainant is entitled.

[Ed. Note.—For other cases, see Courts, Cent. Dig. § 921; Dec. Dig. § 347.*]

In Equity. Suit by the Medical Society of South Carolina against Frank B. Gilbreth for reformation of a building contract. On exceptions to the report of a special master. Decree for complainant.

Theodore G. Barker, James Simons, J. P. K. Bryan, and Mitchell & Smith, all of Charleston, S. C., for complainant.

T. Moultrie Mordecai, of Charleston, S. C., and Meyer M. Friend, of New York City, for defendant.

CONNOR, District Judge. Upon the maturity of the pleadings the cause was referred to Mr. W. C. Miller, as special master, to hear the evidence, and find and report to the court his conclusions of fact and law. Upon the coming in of the report both parties filed exceptions. The form of the report, while comprehensive and intelligent, is such that it is difficult to discuss the questions raised, by the exceptions, consecutively. Many of the exceptions are directed to findings of evidentiary facts, rather than ultimate conclusions. From the finding of the master that the parties did not make any contract, that there was no meeting of their minds upon the terms of a proposal, he logically concluded that the bill should be dismissed.

[1] The record evidence and admissions in the pleadings disclose the following case: The General Assembly of South Carolina, at its session of 1794, incorporated the Medical Society of South Carolina, with power to hold property and do such acts and things as were necessary and convenient to the purposes for which it was organized.

"The advancement of the science of medicine, the maintenance of the honor and character of the profession, and the promotion of the public health, together with the care of such public charities and bequests as may be legally under its control."

By the will of Thomas Roper, admitted to probate May 25, 1829, certain funds were bequeathed to said Medical Society "for the purpose of erecting and maintaining a hospital for the reception and treatment of sick, maimed and diseased paupers as need medical aid, without regard to religion, complexion, or nation." The city of Charleston, S. C., being the owner of certain property known as the city hospital, and an infirmary, complainant, Medical Society, presented to the city council a memorial, proposing to purchase said property and to remove, or alter, the buildings thereon and transform the same by the erection of a new hospital and infirmary to be known as the "Roper Hospital," and, for that purpose, to expend out of the fund held by complainant, as trustee, under the terms of said will, a sum not exceeding $100,000. The city council, on June 14, 1904, accepted the proposition. The memorial and proceedings of the council are matters of public record on the minutes of the council, and were published in the newspapers in the city of Charleston. For the purpose of se-

curing authority from the court having jurisdiction in the premises to carry out the terms of said agreement, a suit was instituted by complainant in the court of common pleas of Charleston county, setting forth the proposal and its acceptance, by the council, and, upon proceedings had therein, in accordance with the course and practice of the court, a decree was duly entered in said court, authorizing the complainant trustee and the said city council to carry into effect the said agreement.

Pursuant to said decree, the city council executed a deed for said property to complainant, in which said proceeding is set forth. In the proceedings in said cause, and the deed, in which special reference to said proceeding was made, the limitation of $100,000, upon the expenditure to be made by complainant, was set forth. It was necessary that a limitation, upon the amount to be expended by the committee, be fixed because of a provision in the decree that, upon certain contingencies named therein, the city should resume control and take a reconveyance of the property by paying to the complainant the amount expended. Complainant appointed a building committee to carry out said plan, and the city council appointed Mr. Lebby, one of its members, to represent the council in carrying out said agreement. Said committee, of which Dr. R. S. Cathcart was chairman, advertised in the newspapers of Charleston, inviting bids to furnish the labor and material necessary to erect said buildings, etc. The building committee employed, as its architect, W. M. Aiken, to whom was committed the duty of preparing plans and specifications for said proposed building and supervising its construction. H. F. Cook was employed as superintendent of construction. Defendant, Frank B. Gilbreth, a resident and citizen of New York, was engaged in the business of contracting for, and constructing, buildings. His operations extended over different states. Charles R. Clemence was his accredited agent and manager, with authority to submit proposals, and make contracts. for the construction of buildings. Gilbreth had adopted, in his business, a system, or plan, of contracting for buildings, which he termed "the cost plus fixed sum" plan, or basis. The special master says:

"This method, in brief, means, in so far as the amount to be paid by the owner is concerned, a contract whereby the owner pays the actual cost of labor and material, plus a fixed sum to the contractor for his compensation or profit."

Upon the invitation of complainant's architect, Clemence had, prior to the 18th day of April, 1905, begun to make an estimate on the cost of the building, based upon Gilbreth's system. On April 12th, he wrote Dr. Cathcart: That he had been "taking off quantities preparatory to an estimate on the hospital to be built at Charleston." That he had called on Aiken, "and talked over our method of construction, and I am inclosing to you our pamphlet No. 20, termed 'Rapid Construction,' and wish you would carefully look over the same; either Mr. Gilbreth or myself personally anticipate being in Charleston about the 17th, in order to take up this matter with you and your committee. This is in accordance with my talk to-day with Mr. Aiken." Clemence reached Charleston, as he anticipated, met

Dr. Cathcart, other members of the committee, Mr. Lebby, and Mr. Cook, superintendent, and explained to them the Gilbreth, or cost plus fixed sum, method, and each of them told him that the committee was limited to an expenditure of $100,000 and could not consider his plan. Clemence was present with the committee, either at the time of, or immediately after, the bids were rejected. He did not put in a bid; said that he was not prepared to do so. The bids were rejected because they exceeded the limit to which the committee was restricted; this was stated in the presence of Clemence—was well known to him. It was then determined by the committee to instruct Mr. Aiken to revise the plans to bring the cost within the sum of $100,000 and the chairman directed to do so. Clemence explained to the committee the Gilbreth system, and was told that it could not be considered; "that the committee was administering a trust fund and were limited to an expenditure of $100,000." He stated, however:

"That he intended to bid on the second bidding; when the revised plans and specifications were bid on, he intended to submit a bid, and would, in this instance, submit a bona fide bid for a lump sum price, the same as any other contractor, and his reasons for doing so, making an exception to the Gilbreth system, generally, that he wished a foothold in the South, especially a large public building designed by a New York architect, and it would lead to other business; in other words, it was a question of advertisement, and that was his reason stated why he should submit a lump sum bid when the second bids were called for."

Clemence denies this. All of the members of the committee were then present. He further said that if he had made a bid, at that time, it would be in the neighborhood of $141,000, and that, if the committee was in a position to trade that day, he would contract to do the work for $125,000. He was told, again, that the committee would not entertain, or consider, a bid upon his plan; that they were dealing with a trust fund under a specific limitation of $100,000. Clemence denies this, and says that the committee did not tell him that they would not deal with him on the cost plus fixed sum plan; that they made no objection to doing so; they did not tell him that they were handling a trust fund, and could not exceed their limit; or that he would have to submit a bid in the same way as other bidders. He says that he was told by the committee that they could not deal on the percentage basis, and not on the cost plus fixed sum basis. He contradicts, and is contradicted by, every witness who was present at that and other meetings while in Charleston, April 19th and 20th. The weight of the evidence is against him. It is difficult, if not impossible, to find, in the light, not only of the positive, direct evidence of all the witnesses, and the surrounding conditions, that he is correct in his version of what occurred in Charleston at that time. There was no suggestion made by any one that the cost plus fixed sum plan would be considered. Mr. Aiken says that, after Clemence returned to New York, he came to his office and urged the adoption of the Gilbreth plan; that he (Aiken) told him:

"That it had to be done on a lump sum bid, that the committee had made up their minds upon that point, and, inasmuch as they were awarding the

contract, and not he (the architect), their decision was final, and that all bids would be called for on exactly the same basis; identical form to be filled out by each contractor, exactly the same, which was the government contract or city contract, as had been my custom."

Aiken had been in the service of the government and of the city of New York as architect. Aiken says that on another day, April 29th, Clemence was in his office when they were discussing reductions, and again urged the cost plus fixed sum basis, and he told him:

"That it was too indefinite, had no limit whatever; that the committee had decided that there should be a limit; that he had been instructed to cut down the plans and specifications to bring it within or to that amount. * * * He was informed that was the limit without any qualification whatever—absolutely."

This occurred before Dr. Cathcart and Mr. Lebby reached New York. Clemence admits that, after his return from Charleston, he met Aiken in New York and talked over the reductions. He not only denies that Aiken told him that the committee would not consider bids on the cost plus fixed sum basis, but that he said:

"That under the cost plus fixed sum contract these deductions could be made and handled in a more satisfactory way than they could under a lump sum basis, inasmuch as we could save time by starting the building at an early date, and receiving low cost by using that system."

To weigh the testimony of the witnesses and consider the contradictions, it is necessary to notice that, in another important respect, Clemence's testimony is positively contradicted by three witnesses. For the purpose of showing that Dr. Cathcart and Mr. Lebby, at the request of Mr. Aiken, visited New York on April 29, 1905, for the purpose of taking the matter up with him and, as will be seen later, to sustain his version of what occurred on that visit, he says that, at the meeting with Aiken in New York, when he (Aiken) said the reductions could best be made under the cost plus fixed sum basis, Aiken stated:

"That he thought it advisable, in order to hurry matters, to wire or write Dr. Cathcart and Mr. Lebby to see if they could not come to New York, and we would meet in joint session, as to what changes would have to be made, what amount could be expended in the work."

Dr. Cathcart and Mr. Lebby both say that their sole purpose in going to New York was to see Mr. Aiken in regard to the reductions or modifications to reduce the cost to $100,000; they had no other purpose. Mr. Lebby says that he was invited by Dr. Cathcart to go with him to New York to see Mr. Aiken; no suggestion of seeing Clemence. Mr. Aiken says:

"I did not request the presence of Dr. Cathcart and Mr. Lebby; they were sent there by the Medical Society. I was informed by telegraph that Dr. Cathcart and Mr. Lebby would come on to meet me in my office for the purpose of conference, consultation as to cutting down the various details to bring it within the amount; at that time the amount was $100,000."

Dr. Cathcart says:

"I went at the request of the building committee, also requested Mr. Lebby to go. I wired Mr. Aiken we were coming. We had absolutely no agreement to meet Mr. Clemence."

On cross-examination, he says that he may have suggested to Mr. Aiken, in a letter, that he would meet Mr. Clemence in New York. I am brought to the conclusion that Mr. Clemence is in error in saying that Dr. Cathcart and Mr. Lebby were called to New York by Aiken to confer with Aiken and himself. The weight of the evidence is against him. Mr. Clemence had, on every occasion while in Charleston, been told that the committee could not, and would not, deal with him, or consider a bid upon his plan—cost plus fixed sum. He must have known this; he also knew the reason why they could not do so. This was the status of the matter when Dr. Cathcart and Mr. Lebby reached New York on April 29, 1905—well understood by them, by Mr. Aiken, their architect, and Mr. Clemence. Clemence came to Mr. Aiken's office in response to a phone message sent with Dr. Cathcart's approval. The invitation is entirely consistent with the testimony of Dr. Cathcart and Mr. Lebby, regarding his declaration at Charleston that he intended making a "lump sum" bid after the reductions were made, at the second bidding, and also with Aiken's statement to them that Clemence had been going over reductions with him. Clemence says that, at this meeting, he told Dr. Cathcart, Mr. Lebby, and Mr. Aiken that he could not put in a lump sum bid, could not put in a bid in that form; that Mr. Lebby said that he did not see how bids could be considered on cost plus fixed sum basis. Mr. Aiken stated that, inasmuch as the time that the local or Southern bidders wanted was excessive, if the cost plus fixed sum basis was used, a clause could be inserted into the bidder's form, making time the essence of letting the contract; that would give the committee a right to consider the cost plus fixed sum basis in case the other bids were still unsatisfactory, when opened, as to price. That he said he could not put in a bid on that form, even with that form inserted, unless he wrote a letter, mailing it at the same time the estimate was mailed, making the acceptance by the committee of his bid conditional at the time the contract was awarded, if it was awarded, to him. That Dr. Cathcart stated that:

"With the time limit in the contract, and that with the letter following the bid, that that would be sufficient for the committee to consider that bid. but he did not want anything put in the bidder's form that would arouse any suspicion with the Charleston bidders. * * * That was generally assented to by the parties present; it was left with Mr. Aiken to prepare his bidder's form."

This statement is contradicted by Dr. Cathcart, Mr. Lebby, and Mr. Aiken. They each say that no such suggestion was made or assented to. Mr. Lebby says that, after Clemence came, the question of reductions was discussed.

"The statement was again made of the limit of $100,000, but that he, representing the city council, thought that if they found it impossible to construct the building for $100,000 that it was possible that he could get the city council to raise the amount to $105,000 or $110,000. That he was simply a member of the committee and had to submit the whole matter to the whole committee, but he felt confident that the city council would do it. Mr. Aiken was then requested to proceed to modify the plans and specifications so that

the building could be constructed for $100,000, and the revised plans and specifications were to be bid on, and the bids opened publicly at some time in May."

He states, "positively," that there were no arrangements with Clemence "as to his position as a bidder on that work"; that the only purpose of Dr. Cathcart and himself in going to New York was to confer with Mr. Aiken "to see if the plans could not be modified so as to bring it within the limit of $100,000." "There was nothing ulterior, or beyond that. * * * That was the sum total of our going to New York." Both Dr. Cathcart and Mr. Lebby say that, at this meeting, in New York, Clemence repeated that he intended, contrary to his general rule, to put in a lump sum bid, at the second bidding. That he was again told that the committee would not consider a bid based upon the cost plus fixed sum plan; that it must be a pure and simple lump sum proposition according to the plans and specifications of the architect. He was also told so by the architect. Both Dr. Cathcart and Mr. Aiken sustain Mr. Lebby in this statement; they plainly and positively contradict Mr. Clemence. Mr. Aiken's testimony at this point is clear, positive, and specific. He leaves no room for controversy as to what he says and intends to say. His statement, and reasons given, are irreconcilable with Mr. Clemence's statement. Mr. Aiken prepared the form of the proposal, sent it to Mr. Cook, and a second advertisement was inserted in the Charleston papers for bids, to be made upon the forms, plans, and specifications which would be furnished upon application to Dr. Cathcart, chairman of the committee; they were required to be in by May 15, 1905. Mr. Cook says that the form was the same and the advertisement the same as used for first bids, April 20, 1905.

On May 9, 1905, Mr. Cook, superintendent, inclosed one of the forms of "Revised Proposal" to Mr. Clemence, writing him that he did so at the request of Dr. Cathcart; that he wanted him "to fill out one of the proposed sheets in same form as the other bids." He directed Clemence to send it to Dr. Cathcart not later than May 15, 1905. On May 13, 1905, Clemence mailed to Dr. Cathcart, chairman, the "Revised Proposal," signed by himself as manager of Mr. Gilbreth. The "form" is entitled "Revised Proposal for Roper Hospital, Charleston, S. C.," setting forth the work to be done, according to the plans and specifications prepared by Aiken. It is complete as to details, leaving blank the name of the proposer, the amount for which the work was to be done, and the material furnished. Reference is made to contemplated additions and blanks left for the insertion of the amounts bid. The time at which the work was to be completed was fixed at November 15, 1906. "Number of working days, one hundred and sixty." Bidders were required "to guarantee time stated by him, wherein to complete all work indicated by the drawings and specifications." It is further provided that:

"The trustees hereby reserve the right to consider the said time of completion in awarding the contract. * * * No bid, or estimate, will be accepted unless filled out as called for on this form of proposal."

The blanks were "filled in," and defendant's name signed to the proposal by Chas. R. Clemence, manager. The proposal, as signed, is a complete and an unqualified proposition "to furnish all the labor and materials of every description * * * for the sum of "one hundred and nine thousand, three hundred and seventy-five ($109,375.-00) dollars" (written in ink). The provisions relating to the infirmary and to contemplated additions are not material at this time, except to note that the amounts to be paid for them are also fixed—inserted in writing. At the same time, and by the same mail, by which Clemence sent the "Revised Proposal," he wrote, or dictated, and signed, a letter, a correct understanding of which can be had only by its insertion in full:

"May 13, 1905.

"Dr. R. S. Cathcart, Chairman Building Committee, Roper Hospital, Charleston, S. C.—Dear Sir: In your form of proposal for revised bids we notice that you require each bidder to give a satisfactory guarantee of the time limit of the completion of work. We are seldom ever called upon to give a guarantee, any further than that of our reputation, for doing speed work, but in this instance are ready, if requested by you, to give a surety bond. In giving you the completion date we have mentioned in the proposal, we would expect you to close the contract, with us, on our special method of construction, which allows us to do speed work by working in direct harmony with your architect, through his local representative at Charleston. This method of construction insures speed work beyond question, and we can give you the most satisfactory recommendation of this form of contract by not only owners, but also architects and engineers for whom we have done work on this basis. We will be very glad to receive your further consideration of this matter, and would state at this time that in open meeting with your architect, William Martin Aiken, Councilman Lebby and yourself, the advantages of many kinds that you would derive through this method of doing business were fully gone over and understood by all in this meeting. The writer intends to reach Charleston, if possible, not later than Tuesday, and will be very glad to close this matter up finally and commence operations at once in order to complete the building even quicker than the time mentioned in proposal, which I believe is possible.

"Very truly yours, [Signed] Frank B. Gilbreth,
"By Chas. R. Clemence."

This letter was received by Dr. Cathcart at the time the proposal came to him, and, before the proposal was accepted, it was read by him to the building committee, together with all other letters accompanying the bids. Its very peculiar language, in the light of the testimony and surrounding circumstances, invites a careful scrutiny. If it was written and sent under the circumstances and for the reasons testified to by Clemence, and this was known to the building committee, while essentially contradictory of the terms of the "Proposal," the two, read together, may reasonably be construed to constitute a proposition to furnish the material and do the work upon the cost plus fixed sum basis, if so explained to, and understood by, the building committee. If the agreement was made in New York and the committee informed of it, the letter would be read in the light of the agreement and so modify the terms of the bid. The amount named, in that view, would be understood to be merely an estimate. If, however, no such agreement, or understanding, was had between Dr. Cathcart, Mr. Lebby, and Mr. Aiken, on the one part, and Mr. Clemence,

on the other, as testified by the latter, the letter indicates a purpose on the part of Mr. Clemence to make an unconditional proposal to furnish the labor and material for the construction of the hospital for a fixed sum, accompanied by a letter, the terms of which to men unskilled in such business are so obscure as were calculated to mislead them into supposing that it referred only to the "speed limit." To accept Mr. Clemence's testimony convicts Dr. Cathcart, Mr. Lebby, and Mr. Aiken of conduct utterly at variance with their positive, previous assertions, the instructions given them by the committee, the exercise of ordinary intelligence, the character which their position in their professions and community conceded to them by counsel for defendant.

Mr. Lebby's testimony is very clear and satisfactory. He says that he is engaged in the machinery and supply business and is manifestly a man of intelligence and business experience. He fully understood, and clearly saw, the insurmountable difficulty which prevented the committee from dealing with Clemence on the cost plus fixed sum basis, and so stated on every occasion when it was mentioned. He was there for the special purpose of seeing that the terms of the agreement with the city council were observed. Neither ingenuity nor charitable construction can avoid the conclusion that, if they entered into the plan testified to by Mr. Clemence, they violated the trust reposed in them by the Medical Society, the other members of the building committee, and the city council, practiced a legal fraud on other bidders, and subjected themselves to personal liability for an amount dependent altogether on the accuracy and integrity of Gilbreth and Clemence. Defendant's contention, as to what occurred in New York, is supported only by the testimony of Mr. Clemence, who says that this plan or scheme was entered into at the suggestion of Mr. Aiken, Dr. Cathcart, and himself and "assented to by those present." He says that he saw nothing wrong in it. That is a question of ethical standard of business methods.

Postponing, for the present, further comment, it will be well to follow the transaction in its further development. On the morning of May 15, 1905, the bids, of which there were several, were opened by the committee, while in session. On May 16th, Clemence reached Charleston. The bids were tabulated and the building committee, being in session at midday, told him that, his bid "being the lowest," the contract was awarded to Gilbreth. The witnesses present concur in saying that Clemence was told that the contract was awarded to him "as the lowest bid"; that Clemence said "that he was very glad, was very much obliged, etc., that he was ready to sign the contract." Dr. Cathcart says he produced a paper out of his pocket, typewritten paper, and said he wanted to sign immediately; that he told him that they were handling a trust fund, and a paper of that kind would have to be executed in the office of their solicitor; that he would not sign it then, but made an engagement to meet him later in the day at Maj. Barker's office. They met accordingly in the afternoon of that day. Clemence said he was in a hurry to get off that afternoon. The master finds that, in what occurred up to, and including, the ac-

ceptance of the bid of $109,375, as set forth in the "Revised Proposal," the minds of the parties did not meet, because while the "Revised Proposal" was a lump sum bid, free from ambiguity, Clemence never intended to make such a proposal or bid; that he not only intended, but, by sending the letter, he made a bid, the terms of which are to be found in the two papers, the "Revised Proposal" and the letter. He says: "The complainant accepted the proposal unqualified by the letter of May 13th." I interpret this, in the light of other language used by him, especially his "Conclusion of Law"—as finding that the building committee, which was the only agent of the complainant authorized to make a contract, accepted the bid as set forth in the "Revised Proposal," "unqualified" by the language of the letter. Of course this includes the conclusion that, either the alleged secret agreement was not made or, if made, not communicated to the other members of the committee. If, as insisted by Clemence, the letter was written to Dr. Cathcart, for the reason and for the purpose claimed by him, of course the latter understood what was meant and intended by the letter. If this is true, he concealed such knowledge from the other members, constituting a majority of the building committee. If the secret agreement was made, as claimed by Clemence, that fact would, as the master says, show his "mental attitude."

It is not quite clear what opinon the master held in regard to the claim that the agreement was made in New York. His finding leaves the question open. I am of the opinion that the question whether the proposal, with the letter and the acceptance by the committee, constituted a contract and, if so, its terms, cannot be decided until the preliminary question is disposed of. If Clemence's version is correct, it explains why he wrote the letter. If Dr. Cathcart, together with Mr. Lebby and Mr. Aiken, made the alleged agreement with Mr. Clemence, he necessarily knew why the letter was written, and that Clemence did not intend to make a bid as set out in the "proposal." He further knew that, by his silence, he was permitting his associates to enter into a contract which was essentially different from what they understood and intended, a contract which they had repeatedly and uniformly declared they would not make, one which they had no legal power to make. The results following this conclusion are so far reaching and so serious to all parties concerned that it should be reached only upon satisfactory proof. There is not a scintilla of evidence that the other members of the committee had any knowledge of the alleged New York agreement to give the contract to Gilbreth upon his own plan. I am unable to find that any such scheme was entered into in New York. I have not overlooked the entire evidence, some of which tends to sustain Clemence.

Rejecting defendant's contention that there was such understanding between Dr. Cathcart, Mr. Lebby, and Mr. Clemence, the case, in respect to what occurred at Charleston on the morning of May 16th, comes to this: The proposal is made by Gilbreth to furnish the labor and material for the fixed sum of $109,375. The evidence shows that, prior to that time, the city council had consented to extend the limit to $110,000, as suggested by Mr. Lebby in New York; it is signifi-

cant that the bid of Clemence is within $625 of that amount. It is also significant that no estimate—that is, no detailed estimate—had been submitted either to the committee or the architect. Eliminating the letter, there is no room for controversy as to the terms or construction of the proposal and its acceptance. The letter cannot, however, be eliminated because it was received by the chairman and read to the committee. Dr. Cathcart says that he did not "take it that the letter referred in any way whatsoever to the cost plus fixed amount, because Clemence had been told so repeatedly. We took it, his special method of construction was in regard to his speed work, in regard to how he said he had his organization fixed, how he took different contracts all over the country, knew how to get good men and get quick delivery, and in this way he knew how to do speed work. We thought that referred to speed work, and did not connect it in any way with his cost plus fixed sum amount." It is manifest that the other members of the committee did not understand the letter to refer to the cost plus fixed sum plan; they had repeatedly stated that they would not consider it; there is no suggestion that they, or either of them, had seen Clemence since he left Charleston on April 20th, or expressed any change of opinion in respect to his plan or its acceptance. There can be no doubt of the interpretation which they put upon the letter; this is found by the master. Did they properly interpret the letter, in the light of the "Revised Proposal," and what had preceded it? Was it reasonably open to the construction which they put upon it?

While it is true that the minds of the parties to a negotiation must meet, there must be a proposal and an unconditional acceptance before a contract is made. It is also true that, if one make a proposal, complete in its scope, clear in its terms, constituting the basis for an acceptance, and the party to whom it is made accepts the proposal in good faith and incurs obligations thereby, the proposing party will not be permitted, afterwards, to insist that, by reason of language used by him at the time of submitting the proposal, obscure and ambiguous in its terms, which misleads the other party, whether so intended or not, that he did not intend, by his proposal, to be bound by its terms; that his real purpose was to so modify the proposal by a contemporaneous writing, or statement, that upon its acceptance, a different agreement, directly contrary to that contained in the proposal, results. The law will not permit a man to so act, impose obligations, and cause large outlays of money, upon the other party, acting in good faith, upon a reasonable construction of both papers or statements. He must be understood to mean what he says. The original purpose of Clemence was to induce the building committee to make a contract with him in which there would be nothing definite or fixed in respect to the obligations, except his own compensation. The weight of the evidence shows that, failing in this, he expressed his purpose to make a bona fide lump sum bid, and this is what he did, unless it was nullified by the letter. If, on the other hand, his letter to Dr. Cathcart is so clear in its terms that he and the other members of the building committee, as reasonable, sensible,

intelligent men, should have seen and understood that he meant that the proposal was conditioned upon the adoption of the cost plus fixed sum basis, they will not be permitted to say that they did not understand it.

The law is both reasonable and just in the standard which it fixes by which to measure the conduct of men and the extent of their obligations; it demands fair dealing and the exercise of common prudence and fair intelligence. It is worthy of notice that, although the term, which seems to be of his own coinage, "cost plus fixed sum," is used by Clemence in his testimony, it runs through, giving color to all of his conversation, yet, when he is writing a letter, by which it is sought to convert a lump sum proposal into one entirely different, this term is not used by him. The letter opens with a reference to the requirement, in the proposal, that a guaranty would be required as to time of completion, a statement that this was unusual for him to give and the reasons therefor, but that he would give it, in this instance. The use of the term "method of construction," as explanatory of his reason for being able to do "speed work," followed by an enumeration of the conditions under which this "method of construction" enabled him to do "speed work," is significant. It is manifest, either that the letter referred only to the time limit, or was skillfully worded to create that impression. He says, "In giving you the completion date, we have mentioned in the proposal, we would expect you to close the contract with us on our special method of construction"; and the expression used "this form of contract" and "this method of doing business," carefully avoiding the use of the term "cost plus fixed sum," which he had theretofore been so careful to use—is not found in the letter. If the words "cost plus fixed sum" had been used, is it not manifest that the members of the committee would have, at once, recognized the obstacle, which they had so uniformly met and pointed out to him, as preventing them from considering a bid based on that system?

Again, he refers to the fact that "in open meeting with your architect, William Martin Aiken, Councilman Lebby and yourself, the advantages of many kinds that you would derive through this method of doing business were fully gone over and understood by all in this meeting." This is true; he did, in New York, urge "the many advantages" which he insisted they would derive, etc. If, as he says, the cost plus fixed sum basis was agreed upon at that time as the basis of his bid, and the scheme by which it was to be adopted was "assented to by all present," why did he not say so? As bearing upon the construction which should be given definite, unambiguous language in a contract, when in a subsequent clause obscure, ambiguous terms are used and sought to be so construed as to modify or nullify the first portion of the contract, Mr. Bishop says:

"If the main body of the writing is followed by a proviso wholly repugnant thereto, it must necessarily be rejected because otherwise the entire contract will be rendered null." Contr. § 387.

In Jones v. Casualty Co., 140 N. C. 262, 52 S. E. 578, 5 L. R. A. (N. S.) 932, 111 Am. St. Rep. 843, Hoke, J., says:

"While clauses in a contract * * * must be reconciled, if it can be done by any reasonable construction, yet a proviso which is utterly repugnant to the body of the contract and irreconcilable with it will be rejected; likewise, a subsequent clause, irreconcilable with a former clause and repugnant to the general purpose and intent of the contract, will be set aside."

In Johnson v. Insurance Co., 143 Fed. 950, 75 C. C. A. 22, Judge Hook, rejecting a suggested construction of language used in a contract, says:

"Such a construction is irreconcilable with that which the unambiguous conduct of the parties shows that they adopted for their own guidance."

As illustrating the cannon of construction used in the interpretation of obscure, ambiguous language, Walker, J., in Wilkie v. Insurance Co., 146 N. C. 513, 60 S. E. 427, says:

"Words in a contract are to be construed against the party using them if there is any ambiguity. * * * Any other construction would annul plainly expressed provisions of the contract and subvert the leading idea of the parties in making it."

In Garrison v. U. S., 7 Wall. 688, 19 L. Ed. 277, it is held that it is a well-settled rule of construction of contracts that "doubtful expressions should be construed most strongly against the party" using them.

In Noonan v. Bradley, 9 Wall. 406, 19 L. Ed. 757, it is said:

When "a party who takes an agreement prepared by another, and upon its faith incurs obligations," he "should have a construction given to the" language used, "favorable to him. * * * When an instrument is susceptible of two constructions, the one working injustice and the other consistent with the right of the case, that one should be favored which standeth with the right."

In Smith v. Hughes, 6 L. R. (1870-71) Q. B. 587 (607), Blackburn, J., says:

"If, whatever a man's real intention may be, he so conducts himself that a reasonable man would believe that he was assenting to the terms proposed by the other party and that other party, in the belief, enters into the contract with him, the man thus conducting himself would thus be equally bound as if he had intended to agree to the other party's terms,"

—cited with approval in Phillip v. Gallant, 62 N. Y. 256.

These well-settled principles are founded upon reason and justice. They make for righteousness and honesty. Defendant will not be permitted to convert a proposition, made to the building committee, to construct the building for a "lump sum" into a proposition to build it upon an estimate made by him, by resorting to obscure language which misled the other party, and, when his expenditure exceeds the amount "estimated" by many thousands of dollars, evade its legal consequences. He is estopped by his conduct to say that no contract was made by the proposal and its unqualified acceptance. But it is strongly urged that the subsequent conduct of the parties sustains defendant's contention. Upon being informed that the contract had been awarded to Gilbreth "as the lowest bidder," he either produces, or prepares, a contract which he wishes signed. When told that it must be submitted to complainant's solicitor, an appointment is made

to meet for that purpose, at the office of Maj. Barker. When he meets Dr. Cathcart, Mr. Aiken, and Mr. Cook, at Maj. Barker's office, he produced a typewritten paper styled an "Agreement." Consideration of what occurred at this meeting will be postponed. The present quest is for the truth as to whether a contract was made by the acceptance of the proposal.

It will be well to keep in mind that, in accordance with a provision in the proposal, $1,600 was fixed as the sum to be paid if sheathing was used on the exterior of all buildings when studding and metal lathing is specified; this was agreed upon when the proposal was accepted, at a fixed sum. Some time thereafter, other changes were found to be desirable. The city council, upon representation made to it, consented to extend the amount to be expended to $120,000. After some negotiation, the fixed sum of $9,025 was agreed to be paid for this extra work; it is significant that this sum, added to $109,375 plus $1,600, equals $120,000, the final sum to which the city council assented. If the amount to be paid for the building was not fixed, if it was a simple estimate, why so careful to make the final bid for additions equal the final amount fixed, $120,000? Stress is laid upon the fact that, when the work was begun, the estimates for material, subcontracts, and the pay rolls were submitted to complainant, and its superintendent, and approved by them; that they kept a supervision over the work and the material going into it. It is said, and expert witnesses are introduced who testify, that this is unusual when the contract is let out on a lump sum basis. On the other hand, it is said that it was necessary to enable them to keep in touch with and informed as to the character and quality of the material and work, the various subcontracts, etc. Mr. Aiken, who had long experience as an architect, had been in the employment of the government and the city of New York, says:

"By looking at bills of material and labor, if the architect is at all familiar with current prices, he can generally grade whether they are up to the usual standard required and, in approving such things, such vouchers, he was enabled to familiarize with the grade of material and labor going into the building of which he was in charge. * * * It is the architect's duty to preserve the general integrity of the building straight through, both in materials and labor."

Aiken is asked: "Is it usual in your business, when you have a lump sum contract, to instruct your superintendent to approve the pay rolls?" He says: "Not customary, no." Mr. Clemence had stated when this contract was awarded to him that this was an exceptional thing for him to do, that he was not doing the customary and usual thing for him, nor was I doing the usual and customary thing for me; he began by saying it was an unusual thing for Gilbreth to make such a contract as this, and his correspondence, his proposed sheet, and this addenda (the $9,025 extra), named definite amounts, no percentage whatever."

I am unable to see anything unusual, or inconsistent with a due regard to the discharge of the duty imposed upon them, in the conduct of the building committee, and their superintendent, in inspecting the subcontracts and pay rolls of the defendant. They were intrusted with a

trust; the proper execution of which imposed a grave responsibility up-
on the Medical Society and the city council—the erection of a public
hospital and its appointments, the administration of a public charity for
the benefit of the poor, the sick, and the maimed, created many years
before by the humane and comprehensive generosity of a deceased phy-
sician. This was well calculated to call forth vigilant and constant at-
tention. It was also important that a careful lookout be kept on the
amount paid with reference to the progress of the work and the total
amount of the cost. Defendant was a resident of a distant state. The
possibility of his receiving an amount in excess of the progress of the
work, the danger of liens by materialmen and laborers attaching under
the state statutes, demanded a careful watchfulness on the part of
the committee and superintendent. The result shows that, notwith-
standing the vigilance exercised by them, liens to the extent of several
thousand dollars for material are filed and their enforcement sought
against the property. When we examine the testimony regarding the
conduct of the members of the committee, we find that it is consistent
with their construction of the contract. The bills are made out by the
parties furnishing material and subcontractors, to Gilbreth. Upon two
separate occasions—one, when expensive tiling was being used, the
other, in regard to the use of mahogany instead of pine—Dr. Cathcart,
in company with Dr. Simons, called Clemence's attention to the fact
that the change would cost more than the plans called for and that the
committee could not pay for extras; that the cost could not go be-
yond the amount fixed in the contract; that Clemence on each occasion
said that he understood that, and he would take care of the extra cost;
that he had saved money on some other contracts, etc. Dr. Cathcart
is corroborated by Dr. Simons. Mr. Cook also spoke to Clemence
about it, and Mr. Aiken, who, during the time the work was going on,
had been to Europe, says that, upon his return, he went to Charleston
and called Clemence's attention to the fact that he had made these
changes involving additional cost, when he said that he would take
care of them, had saved something on subcontracts, etc. Something
occurred in regard to a change in the porch. Clemence does not very
distinctly contradict the witnesses in regard to these matters. They
are not very important, except as reflecting light upon the controversy
in regard to the terms of the contract and the understanding of its
terms.

After the work had progressed for several months, it was ascertain-
ed that Gilbreth had been paid $118,468.63. Clemence had been called
upon for a statement. He at first said that he was within the limit.
Later he said that he was behind some $6,000, and finally that it would
require $15,000 to complete the building. Dr. Cathcart says:

"I told him that there was a committee meeting and the committee wanted
him to come in. He came into the committee and stated to the committee,
for the first time in the whole proceeding, that the contract was not for a
fixed sum, and that the contract was for cost plus fixed sum, and that he
would overrun the account $15,000 and that was his version of it. At that
meeting Mr. Clemence was asked to put his statement in writing, and I was
instructed to write Frank S. Gilbreth a letter stating the position of the
building committee."

Cook says that, when it was found that Clemence was behind, he said that he would make up his figures and take them to Mr. Aiken in New York.

"I said: 'Mr. Aiken wants you to send a list out, but what is the good of sending a list? Anything that costs over $120,000 Gilbreth has to pay, so I don't see any use of your making a list up.' He said, 'Yes,' he knew that, and that was about all. He afterwards said that he was about $45,000 behind, and 'this contract was a fixed sum for Gilbreth, and that the building committee had to pay the total cost of the building.' "

Dr. Cathcart wrote Mr. Gilbreth that the committee would pay no more, and demanded that he proceed to complete the building. He claimed that the contract was on the cost plus fixed sum basis and declined to do so. In consequence of this correspondence, Mr. Aiken was requested to call on Mr. Gilbreth, in New York. Clemence was present when he did so. Mr. Aiken says:

"In the presence of Mr. Gilbreth I asked Mr. Clemence, I put him this question: Were you not aware that the total sum agreed upon as to the cost of this building, this plant, was $120,000? He acknowledged that he did know it. I asked Mr. Gilbreth if he was aware of the nature of the contract that he was doing work under. He declared that he did not. He confessed his ignorance of how his own business was being carried on. * * * Then I said to him, 'Well, apparently, Mr. Clemence has got you in a hole, and you decline to take care of him, you have gone back on him.' He did not deny it."

Mr. Aiken came to Charleston on December 25, 1905; Mr. Clemence came on the same train. On December 26th, Aiken says that he met Clemence at the St. Johns Hotel. He says:

"I then called his attention to the fact that there was a fixed sum for this contract, $120,000, and asked him if he was not aware of it. He acknowledged that he was; he did not deny it. * * * I asked him how it was that he permitted the cost of the building to so far exceed the amount which had been previously agreed upon, and his reply was that he had expected to take care of it by economical letting of subcontracts, but they had apparently far exceeded his original scheme and got beyond his control, and there he was. Never, at any time, do I recall, from the time the contract was signed, Mr. Clemence denying that he knew what the total cost of this contract was; on the contrary, many times he was asked if he knew it, and he said he did know it."

Clemence, in a general way, and in many instances, specifically contradicts this testimony.

While it is impracticable to set out, or more specifically refer to, other testimony, more or less conflicting and contradictory, I have carefully examined all of the testimony and given it such consideration as was in my power. There is, of course, much in the conduct and declarations of both parties which it is difficult to explain. This is not unusual in transactions of this character. Giving the evidence the most careful and anxious consideration, impressed not only with the large financial interests, but also with the deeper and more personal element unfortunately involved, I am brought to the conclusion that the complainant, through its building committee and the defendant by his agent, C. R. Clemence, on May 16, 1905, entered into a valid contract, by which defendant undertook and obligated to furnish the labor and material, according to the plans and specifications of W.

M. Aiken, architect, for the construction of the "Roper Hospital," for the fixed sum of $109,375 plus $1,600 for sheathing; that the terms of said contract are to be found in the "Revised Proposal" (Exhibit No. 10) filed herein; and that complainant, by accepting said proposal unqualified by the letter, undertook and obligated itself to pay said sum for said labor and material, according to the terms of said "Revised Proposal." The master finds that the additions were made for the fixed sum of $9,025.

We are thus brought to a consideration of the testimony respecting the occurrence in Maj. Barker's office at 4 o'clock p. m. on May 16, 1905. It is manifest that it was the purpose of the parties to incorporate into the "Agreement" the terms of the "contract" which they had made. Neither of them intended to make a new or different contract, or to change the one which they had made. It is essential to clearness of thought to keep in mind the distinction between the declarations and conduct of the several individuals, who figure in this transaction, from the conduct of the building committee. It, and it alone, was authorized to enter into a contract binding complainant. Neither the chairman, architect, superintendent, nor Mr. Lebby, who was not a member of the committee, but represented the city council, charged with the duty of seeing that complainant carried out the terms of the agreement made between them, was authorized to make a contract, or change the terms of that which had been made. Their acts and declarations, while acting within the scope of their assigned duties and powers, is competent and relevant upon the ultimate question—whether a contract was made and, if so, what its terms were.

It will be well to refer to the testimony of Maj. Barker, in regard to the transaction at his office. Mr. Clemence, Dr. Cathcart, Mr. Aiken, Mr. Cook, and Dr. Simons were present. Maj. Barker says that he had been shown the proposal which had been, earlier during the day, accepted; that it was "before us" at the meeting.

"I understood that the purpose of that meeting was to reduce to writing the contract which had been made; that contract consisted of the proposal or bid and the oral acceptance of it. I was informed, in Mr. Clemence's presence, that he was extremely anxious to get off to New York that afternoon."

It was in evidence that the train for New York left Charleston at 5:30 p. m. He says that Mr. Clemence produced a paper (Exhibit 11) which he handed to him. He read it over and compared it with the proposal or bid; thought that it corresponded in its provisions. The proposal or bid set forth the terms upon which Gilbreth proposed to do this work.

"The impression made upon me was that (section 7) was a corresponding provision with the provision of the proposal which read 'for the sum of $109,-375, etc.' * * * It is further agreed that no item of cost entering into the erection of this building will vary the fixed sum of $10,000 dollars, hereinbefore mentioned, except an increase in the cubic contents of the building. * * * I noticed at the time that there was a possible room for confusion as to contractor's compensation, and I advised that the following words should be inserted after the word 'dollar' and after the figures '$109,375,' 'which includes the sum of ten thousand dollars to be received by the contractor for compensation for his services and profits.' I also thought those words were necessary in order to prevent any doubt as to whether the $10,-

·000, called in this paper 'fixed sum,' was to be included in the $109,375, or was to be added to it. This was done in the presence of Mr. Clemence, and he acquiesced in the insertion of these words. I also advised, in the presence of Mr. Clemence, and with his acceptance, the insertion of the words, after article 8, 'It being understood and mutually stipulated and agreed that the contractor will furnish to the owner a security bond conditioned for the sum ·of twenty five thousand dollars, for the proper performance of this contract.' * * * That hasty consideration of that paper styled 'Agreement' brought me to the conclusion that this paper carried out, as far as I could understand it, the contract which consisted of the bid and the acceptance of the bid."

He submitted the paper to Mr. Aiken, who approved it. He read it over to the parties. It does not appear that Dr. Cathcart read it. The other persons present substantially concur with this testimony. Clemence says that he consented to the proposed changes. He did not think they changed the contract. They are found written into the "Agreement" in the handwriting of Maj. Barker. He was examined, at much length, in regard to the terms of the surety bond, and of the addition made on May 31, 1905, when the amount to be expended was extended to $120,000. Maj. Barker drew the agreements, pleadings, decrees, etc., in the proceeding in the chancery suit, the deed, etc. The "Agreement" prepared by Mr. Clemence, which it is the purpose of this suit to have reformed, contains the usual provisions found in such agreements in regard to the construction of buildings. There is some controversy as to the time and place at which it was written. Dr. Cathcart says that Mr. Clemence, immediately after he was notified that Gilbreth had been awarded the contract as "the lowest bid," said that he was ready to sign a contract and produced a paper from his pocket. Mr. Clemence denies this and says that he went to his room at the hotel and drew the "Agreement." He says:

"That form was composed by similar contracts under cost plus fixed sum basis, copies of which form I had with me at all times."

Dr. Cathcart is asked whether, while at Maj. Barker's office, or while Clemence was in Charleston, anything passed between Clemence and himself in regard to the work being done on a commission basis. He answered, "Absolutely nothing." It is significant that, although the proposal and acceptance were made before he says he drew the agreement, the date and amounts are written in ink, into the typewritten form. It is also worthy of note that, although he says he had the form of the cost plus fixed sum contract with him, and drew the "Agreement" from "that form," he did not use the "form of contract" upon which he says the acceptance of the proposal was conditioned pursuant to the New York scheme. Mr. Cook corroborates Dr. Cathcart in regard to Clemence's taking the paper from his pocket. An analysis of the "Agreement" discloses that:

"Article 1 is substantially in the words of the 'Revised Proposal.'

"Articles 2 to 4, inclusive, relate to details not affecting the substance of the contract.

"Article 5 refers to the time of completion—not later than November 15, 1905.

"Article 6 reserves the right to the 'owner' to furnish any material required for the work contracted for and to discharge any man or men employed on the work."

In article 7 we find the germ of the trouble:

"It is hereby mutually agreed by and between the parties hereto, that the sum to be paid to the contractor by the owner for said work and materials shall be the actual cash cost of the work herein contracted for plus the fixed sum of $10,000 dollars, which latter sum is to be received by the contractor in full compensation for his services and his profits. The contractor's itemized book estimate of the work, as per plus plans and specifications on which he bases his fixed sum of $109,375 dollars (in Maj. Barker's handwriting) which sum includes the sum of ten thousand dollars to be received by the contractor for compensation for his services and profits. It is further agreed that no item of cost entering into the erection of this building will vary the fixed sum of $10,000 dollars hereinbefore mentioned, except an increase in the cubic contents of the building."

Article 8 provides that the cost of labor and materials are to be paid for during the process of construction; the bills to be carefully checked by the contractor and forwarded to the owner, etc. To this section Maj. Barker made the addition in regard to the bond.

Article 9 provides that the books of the contractor shall be open at all times to the authorized representatives of the owner.

Article 10 provides that:

"The contractor's profit, above referred to, is to be paid by the owner monthly in proportion to the progress of the work, the final payment to be made thirty days after the completion of the work."

It will be observed that every article in this "Agreement," except the seventh, relates to matters of detail, not affecting the substance or changing, in any material respect, the terms of the "Revised Proposal" and acceptance. This section eliminated, the remainder, read in the light of the proposal, expresses the essential terms of the contract made by the building committee and the defendant, by his manager, Chas. R. Clemence. The seventh article differs essentially from the basic character of the contract. It converts it from a lump sum contract for $109,375 into a contract to pay "the actual cash cost of the work, plus the fixed sum of $10,000." The chairman of the building committee had no authority to make this change. In ascertaining what Maj. Barker understood, I am not inadvertent to the correspondence between him and Gilbreth in regard to the condition of the bond, or the additional work for which the master finds that the parties agreed upon the fixed amount of $9,025. It is evident that there was confusion of thought in regard to some of the provisions of the "Agreement." This is not surprising in view of the insertion of several of its provisions, and the hasty examination of it before signing. That an estimate, claimed to be the basis of a proposal made by one engaged in the business of making estimates for building, should fall short by $24,940 plus $12,000, of the cost of the building, is, to a layman, startling. The result more than justifies the caution of the building committee and its insistent refusal to accept an "estimate" as a basis for making a contract.

It is, however, strongly, with ability and learning, insisted that a court of equity either has no power to give relief or, by reason of the manner in which complainant's bill is drawn, cannot do so in this suit.

I concur with the master in his conclusion that the insertion of the suggested clause would not make the agreement conform to the terms of the proposal and acceptance. There is evidence on the part of members of the building committee that, in some of the conversations had with Clemence, he said that complainant would receive the benefit of any saving in purchases and in subcontracts. This may be accounted for by the evident disposition on the part of Clemence to "puff" his "system," or "basis." Several of them say that he was very "loquacious"; no such provision or suggestion is found in the "proposal," and it is to this that we must look for the terms of the contract. The master is of the opinion that there was no contract "to which the agreement should be made to conform." For the reasons set out, I cannot concur in this conclusion. Is the complainant, upon the allegations in its bill and the evidence, entitled to the relief prayed for, or to any other relief in this court? The bill is drawn with a view of invoking the equitable remedy of reformation, based upon mutual mistake and inadvertence. The material facts upon which relief is prayed are fully set out. There is the usual prayer for other and further relief. The briefs filed by counsel for the respective parties are full and helpful.

[2] Care must be observed to keep in mind the fact that the relief demanded here is not based upon the allegation that a mistake was made in the treaty, or negotiation, resulting in the formation of a "contract," the terms of which were not understood. The terms of the proposal and its acceptance were sufficient to bind the parties, if nothing further had been done. Nothing was written into the proposal, or said at the time of its acceptance, about any further writing. When made and accepted, there was no suggestion that any other writing was necessary. The question of details would have been solved by applying the standard of the trade, custom, etc., in the performance of such work. The plans and specifications were, by express reference to them as the basis of the bid, written into the proposal. No controversy has arisen in regard to either. If the conclusion reached, that the proposal and its acceptance constituted a contract, is correct, it follows that the "Agreement" not only does not correctly express the terms of such contract, but radically changes them; the two cannot stand together. I am not inadvertent to the attitude of defendant to the contrary, his insistence that the "Agreement" correctly expresses the terms of the contract, and that, if it does not, complainant, for other reasons, is not entitled to relief.

In Walden v. Skinner, 101 U. S. 583, 25 L. Ed. 963, Clifford, Justice, says:

"Where an instrument is drawn and executed that professes or is intended to carry into execution an agreement, which is in writing or by parol, previously made between the parties, but which by mistake of the draftsman, either as to fact or law, does not fulfill or which violates the manifest intention of the parties to the agreement, equity will correct the mistake so as to produce a conformity of the instrument to the agreement; the reason of the rule being that the execution of agreements fairly and legally made is one of the peculiar branches of equity jurisdiction."

In Snell v. Insurance Co., 98 U. S. 85, 25 L. Ed. 52, Harlan, Justice, discussing a bill for reformation of an insurance policy, says:

"In the attempt to reduce the contract to writing there has been a mutual mistake, caused chiefly by that party who now seeks to limit the insurance to an interest in the property less than that agreed to be insured. The written agreement did not affect that which the parties intended. That a court of equity can afford relief in such a case is, we think, well settled by the authorities."

The language of the learned justice is applicable to the evidence in this case. He says:

"He (plaintiff) trusted the insurance agents with the preparation of a written agreement which should correctly express the meaning of the contracting parties."

In Thompson v. Insurance Co., 136 U. S. 287, 10 Sup. Ct. 1019, 34 L. Ed. 408, in which the reformation of an insurance policy was sought, Mr. Justice Harlan again says:

"If, by inadvertence, accident, or mistake, the terms of the contract were not fully set forth in the policy, the plaintiff was entitled to have it reformed, so as to express the real agreement, without the necessity of resorting to extrinsic proof."

In this case there was a demurrer to the bill. There, the bill charged that the terms of the contract of insurance were agreed upon and that "by inadvertence, accident, or mistake, upon the part of both Kearney and the company, the policy was not so framed." Upon demurrer the court made a decree reforming the policy to express the terms of the contract.

In Simmons Creek Coal Co. v. Doran, 142 U. S. 417, 435, 12 Sup. Ct. 239, 245 (35 L. Ed. 1063), Fuller, C. J., says:

"The jurisdiction of equity to reform written instruments, where there is a mutual mistake, or mistake on one side and fraud or inequitable conduct on the other, is undoubted; but to justify such reformation the evidence must be sufficiently cogent to thoroughly satisfy the mind of the court."

In Elliott v. Sackett, 108 U. S. 132, 2 Sup. Ct. 375, 27 L. Ed. 678, plaintiff contracted to purchase a tract of land upon which there was an outstanding mortgage; he contracted to take title subject to the mortgage. When the deed was written, and received by him, it contained a clause stating that he assumed the payment of the mortgage debt. Upon a bill to reform the deed by making it conform to the terms of the contract, Blatchford, Justice, says:

"The actual contract of the parties, as understood by both of them, is shown by the written agreement. Nothing was agreed upon to vary that. Sackett, as he shows by his testimony, knew the difference as to liability which the difference in the language would make, and knew what the language of the written agreement was, and must be held to have understood it to mean what it does mean, and to have known that Elliott understood it in the same sense. * * * Under all the circumstances proved in this case (and every case of the kind must depend very largely on its special circumstances), Elliott had a right to presume that the deed would conform to the written agreement, and was not guilty of such negligence or laches, in not observing the provisions of the deed, as should preclude him from relief. * * * The deed did not effect what both parties intended by the actual.

contract which they made, and the cause is one for the interposition of a court of equity."

"When the instrument purports to carry into execution an agreement which it recites, and exceeds or falls short of that agreement, there is no difficulty in rectifying the mistake; for there is clear evidence in the instrument itself that it operates beyond its real intent. If, however, there is no recital of any agreement, but a mistake is alleged, and extrinsic evidence tendered in proof that it was made, the limits of the equity for correction are more difficult to define. * * * It seems, however, that the instrument may be corrected if it is admitted or proved to have been made in pursuance of a prior agreement by the terms of which both parties meant to abide, but with which it is in fact inconsistent." Adams' Eq. 170.

"If an instrument has not been drawn so as to express the true intention of the parties, to enforce it, in its existing condition, would be simply to carry out the very mistake or fraud complained of; while to set it aside altogether might deprive the plaintiff of the advantages of a contract to which he is lawfully entitled. It is obvious, therefore, that the only true measure of justice in such a case is the equitable remedy by reformation (or correction as it is sometimes called), by means of which the instrument is made to conform to the intention of the parties, and is then enforced in its corrected shape." Bispham, Eq. § 460.

As said by the author, this power to correct, or reform, an instrument, does not carry with it the power to make a contract for the parties.

"The occasions which most frequently give rise to this equitable remedy are cases of mistake or fraud. Thus, when a settlement is executed with the design of carrying out prior articles, but which is so drawn by mistake that it fails to conform to the intention as expressed in the articles, a bill in equity will lie for the purpose of reforming the instrument so that the original intention of the parties to the settlement may not be defeated." Id.

[3] The foregoing, and many other authorities, state and illustrate the distinction between a bill in which a correction or reformation, in respect to the terms of the contract, entered into between the parties, is sought, and one in which the writing, by which it was intended to express, make a memorial of, a contract theretofore made and entered into, by reason of accident, inadvertence, or mistake, fails to correctly perform the purpose for which it is executed. Complainant's case is dependent upon maintaining the primary proposition that the contract was made by the proposal and acceptance. In the structure of the bill this averment is made the foundation upon which equitable relief is asked. If, as the master finds, there was no contract, or if, as alleged by the defendant, there was a contract the terms of which were as he contends, of course the remaining allegations of the bill have no basis upon which to rest, and the conclusion reached by the master that the bill should be dismissed is, for that reason, correct. Defendant insists that, upon the evidence, no mistake, either of fact or law, is shown in the terms of the "Agreement"; that it correctly sets forth and expresses the terms of the "contract." He further says that, conceding, pro hac vice, that Dr. Cathcart, the chairman of the committee, was mistaken in supposing that the terms of the "Agreement" expressed the terms of the "Proposal," "unqualified by the letter," Mr. Clemence was not mistaken in that respect; that he knew that the terms of the "Agreement" corresponded with and expressed the terms of the "Proposal" as qualified by the letter; that

there was therefore no mutual mistake in respect to the terms of the "Agreement." He concludes that, from this condition of the case, complainant is not entitled to reformation of the "Agreement"; that the only relief, from any viewpoint which can be given, is cancellation.

The witnesses concur in saying that it was their purpose to incorporate the contract, or, as Maj. Barker says, "the written proposal and parol acceptance," into the "Agreement." There was no suggestion that any change or alteration in its terms was to be made, nor was any one authorized by the building committee to do so. Mr. Clemence expressed anxiety that it be executed at once as he was anxious to get off to New York. This may have been accidental; but it resulted in a hurried execution of a paper which involved a large sum of money and required a much more careful examination than could be given to it within the time intervening before he left the city. There was undue haste in its examination and execution. In the obscurity lurking in the language, there was ample room for mistake as to its meaning, especially by one not accustomed to making such contracts and not familiar with their form. To say the least, the draftsman may have easily made it much clearer. ·The proposed insertion by Maj. Barker indicated that he did not comprehend the legal import of the language used. In our quest for the truth in such transactions, incidents and language, conduct and omissions apparently trivial, linked together, point the way to truth.

From the view which I take of the testimony, the drafting and procuring the execution of this "Agreement" was the concluding act in the attempt, the determination, to secure from the building committee a contract which its members and all others representing it had repeatedly and uniformly declared that it would not make with Clemence. The question arises why, if he understood at that time that the secret scheme, which he says was entered into in New York, had been successfully consummated, the "Revised Proposal" having served the purpose assigned to it, had no further part to play in the transaction, did he not frankly say so, and not, by his silence, permit Maj. Barker to advise his client upon the supposition that the contract consisted in the "proposal" and its acceptance? He makes no reference to the letter, which he claims was the basis of the contract. That Dr. Cathcart made no such reference is consistent with his testimony that he did not understand it as affecting the terms of the proposal. The overwhelming weight of the evidence, sustained by the reason of the thing and "inherent probabilities," shows that Dr. Cathcart, the chairman of the committee, executed the agreement under the belief that it conformed to the contract; that he was mistaken in respect to the legal effect of the language contained in the seventh article, upon the essential terms of the contract—it was a mistake of law. It is equally clear that, in advising its execution, Maj. Barker and Mr. Aiken were also mistaken as to its effect. The real question, however, is the state of mind under which the chairman acted. It is also clear that Mr. Clemence knew that they were laboring under the mistake. It is difficult, if not impossible, to avoid that conclusion.

[4] That a mistake of law of both parties, or by one party, induced, or brought about, by such conduct of the other as makes it inequitable on his part to take advantage of such mistake, is remedial in a court of equity, is well settled by the best-considered authorities.

Prof. Pomeroy says:

"Whatever be the effect of a mistake pure and simple, there is no doubt that equitable relief, affirmative or defensive, will be granted, when the ignorance or misapprehension of a party concerning the legal effect of a transaction in which he engages, or concerning his own legal rights which are to be effected, is induced, procured, aided, or accompanied by inequitable conduct of the other parties. It is not necessary that such inequitable conduct should be intentionally misleading, much less that it should be actual fraud; it is enough that the misconception of the law was the result of, or even aided or accompanied by, incorrect or misleading statements, or acts of the other party. When the mistake of law is pure and simple, the balance held by justice hangs even; but, when the error is accompanied by any inequitable conduct of the other party, it inclines in favor of the one who is mistaken. The scope and limitations of this doctrine may be summed up in the proposition that a misapprehension of the law by one party, of which the others are aware at the time of entering into the transaction, but which they do not rectify, is a sufficient ground for equitable relief. A court of equity will not permit one party to take advantage and enjoy the benefit of an ignorance or mistake of law by the other, which he knew of and did not correct." 2 Eq. § 847.

"A mistake exists when a person, under some erroneous conviction of law or fact, does or omits to do some act which, but for the erroneous conviction, he would not have done or omitted. It may arise either from unconsciousness, ignorance, forgetfulness, imposition, or misplaced confidence." Bispham's Eq. § 185.

In Griswold v. Hazard, 141 U. S. 261, 11 Sup. Ct. 972, 999, 35 L. Ed. 678, it appeared that a writ of ne exeat had been served upon one Durant at the suit of Hazard. He was arrested by the sheriff and confined in jail. At the request of a mutual friend, Griswold went to the jail for the purpose of aiding in securing Durant's release by giving bond. He met, at the jail, counsel of Hazard, and also of Durant. There was a discussion between them respecting the character, and an agreement made as to the terms of the bond to be given. The parties thereafter met, and a bond was executed by the terms of which Griswold was made liable for the performance of such judgment as might be rendered in the suit against Durant. A decree was rendered against him for a large amount. Griswold, alleging that, in signing the bond, he supposed that he became responsible only for Durant's appearance, that he was mistaken in that respect, filed a bill in equity asking a decree for reformation, etc. The bill was dismissed in the Circuit Court. As indicating the grounds upon which defendant resisted and the court refused relief, Mr. James C. Carter, counsel for plaintiff, assigned as error:

"That the court below erred in acting upon the view that, in order to entitle the complainant to relief, it was necessary to show that both parties to the instrument understood that it was a bond for the appearance only of Durant in the equity suit, and that it was not enough to show that the complainant, Griswold, supposed it to be of that character, and that the obligees took it, well knowing, or having good reason to know, that such was the belief under which the complainant Griswold was acting."

The evidence was discussed at length by Mr. Justice Harlan. He finds, rejecting the contention of defendant, that the bond was executed under a mutual mistake "as to the legal effect of the instrument. There was no mistake as to the words of the bond, for it was drawn by one of Hazard's attorneys, and was read by Griswold before signing." While it is true that the learned justice finds that, although written by one of Hazard's attorneys, and its language understood by him, as well as by Griswold, Durant's attorneys, all eminent in their profession, being also present, yet he says:

"The instrument does not express the thought and intention which the parties had at the time of its execution. And this mistake was attended by circumstances that render it inequitable for the obligees of the bond to take advantage of it. The instrument was drawn by one of Hazard's attorneys and was presented and accepted as embodying the agreement previously reached. * * * A court of equity ought not to allow that mistake, satisfactorily established, and thus caused, to stand uncorrected, and thereby subject a surety to liability he did not intend to assume and which, according to the decided preponderance of the evidence, there was, at the time, no purpose to impose upon him. While it is laid down that a mere mistake of law, stripped of all other circumstances, constitutes no ground for the reformation of written contracts, yet the rule that an admitted or clearly established misapprehension of the law does create a basis for the interference of courts of equity resting on discretion, and to be exercised only in the most unquestionable and flagrant cases, is certainly more in consonance with the best-considered and best-reasoned cases upon the point, both English and American."

It will be noted that the court found, against the positive testimony of several witnesses, that the mistake was mutual. Of the witnesses it was said:

"They were intelligent, of equal credibility and had equal opportunities to know what occurred" and "without any reason to suspect that they would intentionally deviate from the line of absolute truth."

Great weight was attached to "the inherent probabilities of the case." The learned justice proceeds to say:

"The conclusion reached upon this branch of the case is the only one consistent with fair dealing towards those who were willing to become sureties for the appearance of Durant. * * * If the attorneys of Hazard intended to obtain, by means of a bond, more than he was entitled to, by such bond as the writ of ne exeat called for, and more than the court would ordinarily have given them upon Durant's application to discharge the writ; if they intended to secure a bond that would make Griswold personally liable within the penal sum, for any money decree passed against Durant—then a fraud was perpetrated upon him which entitles him to relief. * * * It must be assumed that Hazard's attorneys knew that he signed the bond in the belief that, pursuant to the previous understanding, it was one to secure Durant's appearance, nothing more, and yet they failed to inform him, at the time, that it was drawn so as to impose upon him a much larger responsibility. Their silence upon the question was, under the circumstances, equivalent to a direct affirmation that the bond meant what Griswold supposed it did."

The contention that Griswold was guilty of laches was also discussed and rejected. The discussion of that question is enlightening, here. The court reached the conclusion that, if Durant was living, the plaintiff was entitled to a decree reforming the bond; but, as he was dead, an injunction was granted against the prosecution of any action against Griswold on account thereof.

In Cathcart v. Robinson, 5 Pet. 266, 8 L. Ed. 120, Judge Marshall, after discussing the evidence, says:

"These circumstances, taken together, satisfy the court not only that Mr. Cathcart signed the agreement, believing that it left him at liberty to relieve himself by paying the penalty, but that Mr. Robinson knew how he understood it. * * * No untruth has been suggested; but if Mr. Robinson knew that Mr. Cathcart was mistaken, knew that he was entering into obligations much more onerous than he intended, that gentleman is not entirely exempt from the imputation of suppressing the truth."

"When a man, through misapprehension or mistake of the law, parts with, or gives up a private right of property, or assumes obligations upon grounds upon which he would not have acted but for such misapprehension, a court of equity may grant relief if, under the general circumstances of the case, it is satisfied that the party benefited by the mistake cannot in conscience retain the benefit or advantage so acquired." Kerr on Fraud & Mistake (4th Ed.) 467, cited with approval in Reggio v. Warren, 207 Mass. 525, 93 N. E. 805, 32 L. R. A. (N. S.) 340, 20 Ann. Cas. 1244.

Mr. Bispham says:

"The true conclusion, as to the general rule, would seem to be that equity will not interfere in the case of a pure mistake of law; but that any additional circumstance will readily be laid hold of by the court, as constituting sufficient grounds for interposition. Thus, when ignorance of the law exists on one side, and that ignorance is known and taken advantage of by the other party, the former will be relieved." Eq. 188.

[5] I do not perceive any reason for refusing relief because of the status of the subject-matter of the controversy. Complainant has paid the full amount due upon the contract. Defendant has not performed any work, or furnished any material, since complainant notified him that it would pay no more. Although he claims that he made an estimate that the building would cost $99,375, without any notice to the committee, he now asserts that it cost him some $25,000 in excess, to which amount must be added the sum expended by complainant to complete it, alleged to be some $12,000. Liens to the amount of some $7,000 have been filed and suits brought for their enforcement against the building. The contract has been executed, the building completed. The necessity for application to equity for relief is found in the fact that defendant has instituted an action at law against complainant for the recovery of a large amount, alleged to be due for material furnished in the construction of the building. It further appears that complainant alleges that it has expended a large sum in the completion of the building which it seeks to recover of defendant. The bill prays for a decree reforming the "Agreement," so that it shall conform to the terms of the contract, and for the sum expended by it in completing the building, also for an injunction enjoining defendant from prosecuting his action at law, and for other and further relief.

[6] I am of the opinion that, under a fair construction of the allegations of the bill, and of the case made by the evidence, a decree should be entered so reforming the "Agreement" that it shall correctly express the terms of the contract. While this cause was begun and argued before the new equity rules were put in force, the language of rule 19 (33 Sup. Ct. xxii):

"The court, at every stage of the proceeding, must disregard any error or defect in the proceeding which does not affect the substantial rights of the parties"

—expresses the conclusion to which courts of equity had arrived before the adoption of the rule.

"If a bill can be viewed either as one sort of a bill or another, the courts will adopt that view of it which best justifies the relief to which plaintiff is entitled." Street's Fed. Eq. Prac. § 288.

In Griswold v. Hazard, supra, the conditions having so changed that reformation of the bond did not meet the equities, the court directed that defendant be perpetually enjoined from prosecuting an action on the bond as executed.

A decree will be drawn so correcting and reforming the "Agreement" that it shall conform to the contract, the terms of which are found in the "Revised Proposal," and its acceptance, by complainant's building committee. As the master held that the bill should be dismissed, he did not pass upon complainant's prayer for a decree directing the payment of the amount expended in the completion of the building. The questions involved in that branch of the case, both of law and fact, are re-referred to the special master, with direction to report his conclusion of fact and law in regard thereto. Let a decree be drawn accordingly.