**UNITED STATES of America,**
**Plaintiff,**

v.

**MEDICAL SOCIETY OF SOUTH CARO-LINA, a corporation, Board of Commissioners of Roper Hospital, Edward F. Parker, individually and as Chairman of The Board of Commissioners of Roper Hospital, C. A. Robb, individually and as Administrator of Roper Hospital, Defendants.**

Civ. A. No. 68–671.

United States District Court
D. South Carolina,
Charleston Division.

March 10, 1969.

Stephen J. Pollak, Asst. Atty. Gen., Maceo W. Hubbard, Atty., Dept. of Justice, Washington, D. C., Klyde Robinson, U. S. Atty., and Thomas P. Simpson, Asst. U. S. Atty., Charleston, S. C., for the Government.

Joseph R. Young, Charleston, S. C., for defendants.

## FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER

MARTIN, Chief Judge.

This action was instituted on June 29, 1968, by the Attorney General on behalf of the United States, pursuant to Titles II and VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000a, 2000e, to restrain the defendants from operating Roper Hospital in Charleston, South Carolina, on a racially segregated basis and from discriminating against Negro employees and applicants for employment on the basis of their race or color.

The defendants have answered by way of general denials. The parties have filed with the Court a Stipulation, which reflects that there is no dispute between the parties as to the material facts except as indicated in said Stipulation.

The Court, after carefully considering the record, hereby enters its Findings of Fact, Conclusions of Law, and Order.

## FINDINGS OF FACT

1. The defendant Medical Society of South Carolina (hereinafter the Society) is a corporation organized and existing under the laws of the State of South

Carolina. The Society owns and operates a hospital known as Roper Hospital, which is located at 316 Calhoun Street, Charleston, South Carolina, in a complex of hospitals and other medical buildings in that part of the city.

2. The defendant Board of Commissioners of Roper Hospital (hereinafter referred to as the Board) is the governing body of the hospital, and manages the hospital on behalf of the Society. The defendant Edward F. Parker is the Chairman of the Board. The defendant C. A. Robb is the Administrator of the hospital and responsible for its daily operation.

3. By the will of Thomas Roper, admitted to probate May 25, 1829, certain funds were bequeathed to the Society "for the purpose of erecting and maintaining a hospital for the reception and treatment of such sick, maimed and diseased paupers as need medical aid, without regard to religion, complexion, or national origin."[1] Pursuant to the will, and after complex litigation,[2] the original Roper Hospital, located on Queen Street in Charleston, was completed in 1856 and became the first community hospital in South Carolina. Until 1959, the old Roper Hospital was the primary facility used for the care of Negro patients in Charleston County, South Carolina.

4. In 1946, the new Roper Hospital was opened at its present location, and the old Roper Hospital was closed in 1957. Presently, Roper is a general hospital with a bed capacity of 322. The services of the hospital are set up in departments, including medical service, surgical, anesthesia, pediatrics, obstetrics, operating room, X-ray, physical therapy, laboratory, pharmacy, electroencephalograph, electrocardiograph, recovery room, intensive care, private outpatient department, dietary, administrative, laundry, maintenance, housekeeping, School of X-Ray Technology, and the School of Practical Nursing, medical records department and business administration department.

## COVERAGE UNDER TITLE II

5. On the premises of Roper Hospital, immediately adjoining the lobby on the ground floor, there is located a snack bar. There are a number of small tables and a counter on the premises of the snack bar and food is sold there for consumption at these tables and the counter. The snack bar served sandwiches, hamburgers, hot dogs, soft drinks and other beverages, and similar items, all in a form suitable for consumption on the premises.

6. Also on the premises of Roper Hospital, immediately to the rear of the lobby on the ground floor, there is located a cafeteria. The cafeteria has one dining room consisting of two adjoining dining areas, one with 14 tables and the other with 21 tables, and patrons eat their food at these tables. The cafeteria serves full meals including steak, chicken, pork chops, roast beef, seafood, numerous vegetables, breads, salads and desserts. All of the food served in this cafeteria is sold in a form suitable for consumption on the premises.

7. Both the snack bar and the cafeteria are operated for the convenience of employees and visitors of patients at the hospital[3] including persons from outside the State of South Carolina, such as out-of-state visitors to patients. No inquiry is made of patrons as to their state of origin, or as to whether they are interstate travelers. No attempt is made to purchase only food originating in South Carolina, and a substantial portion of the food and other products sold at the snack bar and at the cafeteria has moved in interstate commerce from other states to South Carolina.

---

1. See Medical Society of South Carolina v. Gilbreth, 208 F. 899, 901 (D.S.C.1913).

2. See footnote 1, above.

3. There is no evidence that any Negro has been denied service at either the snack bar or the cafeteria and both facilities are used by Negro employees. The fact that the eating establishments are not segregated does not, however, affect the derivative coverage of the Hospital.

8. The snack bar and cafeteria are held out as serving the same persons as are served by the hospital as a whole. There are signs posted in various parts of the hospital indicating the location of each of these facilities. In the booklet entitled "At Roper Hospital," which is made available to patients upon arrival as well as to visitors and other persons, the eating facilities are described as follows:

THE SNACK BAR is located on the ground floor as indicated in the diagram on page 4. It is for the use of visitors and personnel as well as those patients who are able to use it.

CAFETERIA. The cafeteria is situated on the ground floor as indicated in the diagram on page 4. This facility is operated seven days a week for the noon meal only. Hours of operation are 11:30 A.M. to 1:15 P.M.

## THE HOSPITAL'S PRACTICES VIS-A-VIS NEGRO PATIENTS

9. Following closing of "Old" Roper Hospital, Negro patients in Charleston have been cared for at Medical College Hospital, St. Francis Xavier Hospital, and Negro-operated McClennan-Banks Hospital. More than 10,000 patients are admitted to bed care at Roper Hospital in an average year; but, with very few exceptions, there have been no Negro inpatients at Roper Hospital.

10. In 1965, following the enactment of Title VI of the Civil Rights Act of 1964, 42 U.S.C. 2000d et seq., prohibiting federal financial assistance to recipients, including hospitals, which fail to comply with federal desegregation requirements, the doctor who was then Chief of Roper's medical staff brought before the Society a motion to sign a compliance agreement pursuant to the Civil Rights Act of 1964 and the Guidelines duly promulgated pursuant thereto. The motion was defeated on the stated ground that the members felt that federal aid would ultimately lead to federal interference with Roper Hospital policy. Roper Hospital also discontinued its participation in all federal programs. The plaintiff contends, but the defendants deny, that the Hospital's refusal to sign a compliance agreement and to continue participation in federal programs, were predicated, in whole or in part, on the Hospital's racial policies. The defendants contend that Roper Hospital's failure to renew contracts for federal programs was due to the federal government's refusal to make financial arrangements satisfactory to Roper Hospital. In view of the other Findings herein, no specific Finding on this issue is necessary.

11. In March, 1965, in an article concerning Roper Hospital the Charleston News and Courier stated that Roper was:

the only hospital in South Carolina which has said it will discontinue the programs under the Department of Public Welfare.

On June 25, 1966, the News and Courier stated that

In March, 1965 Roper announced it would discontinue programs under the Department of Health, Education and Welfare following the passage of the 1964 Civil Rights Act. The funds had been administered through the State Health Department. Roper is not integrated.

The source of the information was not identified in these articles.

12. Roper Hospital has been and is regarded in the Charleston community, and particularly among Negroes, as a white-only hospital, at least with respect to the admission of inpatients. Accordingly, Negro doctors in Charleston have made no attempt to secure admission of their patients to Roper Hospital, and few if any Negroes have sought treatment at the Hospital on an in-patient basis. Since the effective date of the Civil Rights Act of 1964, the defendants have taken no steps to correct this image.

13. Some Negroes have received treatment in the Physio-therapy Department and have been X-rayed in the X-ray Department, all on an out-patient basis. In connection with the treatment of Negroes on an out-patient basis, there are two waiting rooms in close proximity to

one another in the vicinity of the entrance used by out-patients. The larger and more elaborately equipped of these waiting rooms is in practice used by white persons, whereas the smaller is in practice used by Negroes.

## EMPLOYMENT PRACTICES

14. Roper Hospital employs approximately 523 persons, of whom approximately 232 are Negroes and approximately 291 are whites. It is an employer within the meaning of 42 U.S.C. § 2000e (b).

15. There are approximately 175 doctors on the medical staff of Roper Hospital, all of whom are white. There are at least six Negro doctors in practice in the City of Charleston. All registered nurses, and all supervisory, professional and clerical personnel employed by Roper Hospital are also white, except for one Negro registered nurse who serves in pediatrics. The Hospital also employs one Negro carpenter, one Negro carpenter's helper, and one Negro boiler room mechanic. Except as indicated above, all of the Negro employees serve as orderlies,[4] practical nurses, nurses' aides, messengers, porters, maids and unskilled laborers. Substantially all of the menial work at the hospital is performed by Negroes, although several of the Negroes in menial jobs are high school graduates and many have other qualifications superior to those of some white employees in non-menial positions. Roper Hospital pays lower wages than industrial employers in the Charleston area and defendants contend that white employees or potential employees will not accept some of the lowly paid jobs, but that Negroes will.

16. Until the summer of 1968, racial signs were posted on two doors in Roper Hospital designating white and Negro employee lounges and toilets. These signs remained posted for several years while the equal employment opportunity provisions of the Civil Rights Act of 1964 were in effect.

17. Substantial racial segregation in facilities for employees existed at the time of commencement of suit. On the ground floor of the Hospital, Negro employees, including Negro practical nurses, are assigned lockers in a separate dressing room. Some of the white practical nurses use the all-white dressing room used by registered nurses on the sixth floor. Also on the sixth floor, white and Negro employees use separate lounges, and since there are toilets in each lounge, separate toilets. There is also racial segregation of employees in the Laundry and Dietary Departments, as is more fully set forth below.

18. There are no generally published standards or criteria which govern qualifications for hiring, assignment or promotion to the various jobs at Roper Hospital. Applicants are ordinarily assigned to jobs for which they apply, and those not indicating a preference to jobs in which there is a vacancy. There are no standardized procedures for notifying employees of vacancies in other departments, and replacements are selected by department heads in consultation with the personnel office. Vacancies are not posted, and there is no standardized procedure for applying for them. While the manual for employees, entitled "You and Your Job at Roper Hospital", states that "raises in pay are based upon merit," and that

> "We want to promote you. It is to the advantage of the Hospital when jobs can be filled with men and women who know Roper and upon whom Roper can rely.",

the subjective standards in existence have resulted in the great majority of Negro employees, including those who have considerable length of service and satisfactory performance records, remaining in the least attractive and lowest paid jobs. Many Negro employees

---

4. The position of orderly was formerly held only by Negroes, and at least the last two head orderlies have been Negroes. In recent years, there have been some white orderlies. There are also white practical nurses and nurses' aides.

in menial positions, such as, for example, maids in the housekeeping department, have remained at the lowest paid levels even though some of them have as much as ten years of service. Objectivization of procedures with respect to hiring, assignment, promotion and pay scales will enable the Hospital to assure that the most effective use is made of its personnel, and will also assure to Negro employees their right to equal employment opportunities.

19. Roper Hospital employs 35 nurse technicians (nurses' aides), of whom 16 are Negro and 19 are white. As of August 1968, according to the records of the Hospital, five wards had only white nurse technicians, while five had only Negro nurse technicians. Two wards staffed exclusively by Negro nurse technicians were also staffed exclusively by Negro practical nurses, and the only Negro registered nurse was likewise assigned to one of these wards. Three wards had bi-racial staffs of nurse technicians. Only three of the nineteen Negro nurse technicians were assigned to wards with white nurse technicians.

20. The laundry department of Roper Hospital is staffed by 24 persons, of whom 11 are white and 13 are Negroes. There are separate rest rooms and locker rooms for the Negroes and the whites. The Negro personnel work in one area of the department with machinery which includes washing and pressing machines, and they take uniform and linens through the various processes of washing and ironing. The white personnel work in an enclosed area, sorting, inspecting, folding and if necessary mending the articles.

21. Plaintiff contends that race has been a significant factor in the assignment of employees to the white and Negro areas of the Laundry Department. Defendants contend that the assignment has been based primarily on the choice and qualification of the applicants. With respect to choice, the applications of the current employees disclose that one of the Negroes indicated a preference for the job of mangle feeder and the others expressed no preference. With respect to qualifications, Appendix "A" reflects the information derived from the employees' application forms. The Hospital claims that white persons will not apply for or accept the job now held by Negroes. When vacancies arise in the "white" area of the laundry, they are filled by white persons from outside the Hospital, and vacancies in Negro jobs are likewise filled by other Negroes.

22. Negro employees working in the laundry are required to punch time cards, but white employees are not required to do so.

23. All but one of the white employees of the Laundry Department of Roper Hospital earn more than the Negro employees, regardless of length of service. The parties differ as to the qualifications of the personnel involved. Inspection during the fall of 1968 showed that two white folders, each of whom has approximately an 8th grade education, and each of whom has been with the hospital less than three years, earn $240 per month. By contrast, a Negro mangle feeder with 10 to 12 grades of education and length of service of 11 years, and a Negro presser with an 8th grade education and length of service of 10½ years, earn $235 per month. The wage range of the full-time white female employees is $230 to $290, as contrasted with $225 to $235 among the female Negroes in the Department.

24. The "white" jobs in the laundry, and especially that of "folder" do not require the possession of a high level of skill or training. The four Negro employees listed in Appendix "B" of the Stipulation have from 10½ to 18 years of service in the laundry, and are entitled to preferential consideration to transfer to the "white" section as soon as any vacancy arises and that a suitable adjustment of the pay of present Negro employees in the laundry, and particularly the above-named four, is also necessary and appropriate.

25. The Dietary Department of Roper Hospital employs a Dietitian, an

Assistant Dietitian, a supervisor, six dietary aides and a part-time cashier, all of whom are white. The remaining 48 employees are in service categories, such as dishwasher, potwasher, cart girl, tray girl, vegetable girl, porter, garbage porter, cook and cook's helper, and all of them are Negro.

26. All of the white employees in the Dietary Department earn more than the highest paid Negro in that Department. The position of dietary aide, which consists primarily of checking on the service workers and is cleaner and more pleasant than the work performed by the Negroes, requires no specialized skills. The six white women employed in that category, most of whom are housewives ranging in education from 7th grade to high school graduate and possessing no specialized experience, earn from $265 to $310 per month. The wages earned by Negroes in the Dietary Department range from $210 to $255 per month, and more than half of the Negroes earn $225 per month or less. Two Negro high school graduates employed in 1968 earn $210 per month. A white high school graduate hired as an aide in 1968, by contrast, earns $265 per month. A white dietary aide with a 7th grade education who has received one poor performance rating earns $275 per month.

27. Negroes in the Dietary Department have not been promoted to dietary aide or to any other supervisory position, regardless of their qualifications or length of service at the Hospital. Vacancies in supervisory positions have been filled by persons from outside the Department, all of whom have been white.

28. Four white dietary aides have been employed since the effective date of the Civil Rights Act of 1964. There are Negro employees of the Dietary Department who possess considerable length of service and education equal to that of the present dietary aides, but who were not considered for openings filled by the white employees hired since the effective date of the Civil Rights Act of 1964. An adjustment of wage scales of certain Negro employees is necessary and appropriate, as indicated in Appendix "C"

29. Roper Hospital employed only one Negro as a ward secretary, who left to return to school after a short period; this took place before the commencement of this suit. Four new white ward secretaries were hired during the summer of 1968, on June 21, June 26, July 10 and August 15, respectively. None of these white women listed prior clerical experience on her application. Nine Negro applicants applied for clerical positions between May 21 and August 15, 1968, and each of the nine Negro applicants was a high school graduate with some prior clerical or related experience. One of these nine Negro applicants had a junior college degree and prior experience as a clerk typist, a second had been a bank teller and cashier, and a third had a year of business school and had been a summer legal secretary. None of these Negro applicants was hired.

31. One of the accepted white applicants for the position of ward secretary was hired on the same day that she applied. Two rejected Negro applicants whose qualifications appear to be at least equal to those of the accepted white applicant made application on the previous day. Another of the white applicants was hired ten days after she applied, indicating that Roper considers applicants pending for at least that period.

## CONCLUSIONS OF LAW

1. This Court has jurisdiction of the defendants and of the subject matter of the claims, 42 U.S.C. § 2000a–6 and 42 U.S.C. § 2000e–6.

2. Titles II and VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000a et seq., and 2000e et seq., are to be accorded a liberal construction in order to carry out the purpose of Congress to eliminate the inconvenience, unfairness, and humiliation of racial discrimination. Hamm v. City of Rock Hill, 379 U.S. 306, 85 S.Ct. 384, 13 L.Ed.2d 300 (1964); Nesmith v. Young Men's Christian Associa-

**152**

tion of Raleigh, N. C., 397 F.2d 96 (4th Cir. 1968); Miller v. Amusement Enterprises, Inc., 394 F.2d 342 (5th Cir. 1968); Quarles v. Philip Morris, Incorporated, 279 F.Supp. 505 (E.D.Va. 1968); United States by Clark v. Local 189, United Papermakers & Paperworkers, 282 F.Supp. 39 (E.D.La.1968).

■ 3. Both the snack bar and the cafeteria in the Roper Hospital serve and offer to serve interstate travelers and a substantial portion of the food which each sells has moved in interstate commerce. The food sold in each establishment is prepared in a form fit for consumption on the premises of each. The snack bar and the cafeteria are places of public accommodation within the meaning of 42 U.S.C. § 2000a(b) (2). United States v. Beach Associates, Inc., 286 F. Supp. 801 (D.Md.1968); Newman v. Piggie Park Enterprises, Inc., 377 F.2d 433 (4th Cir. 1967), modified as to counsel fees, 390 U.S. 400, 88 S.Ct. 964, 19 L.Ed.2d 1263 (1968).

■■ 4. Since the cafeteria and the snack bar are located within the premises of Roper Hospital and are held out as serving the same patrons, Roper Hospital is a place of public accommodation within the meaning of 42 U.S.C. § 2000a(b) (4). Adams v. Fazzio Real Estate Co., 268 F. Supp. 630 (E.D.La.1967), aff'd 396 F.2d 146 (5th Cir. 1968) (bowling alley); Evans v. Laurel Links, Inc., 261 F.Supp. 474 (E.D.Va.1966) (golf course); United States by Clark v. All Star Triangle Bowl, Inc., 283 F.Supp. 300 (D.S.C.1968) (bowling alley); United States v. Beach Associates, Inc., 286 F.Supp. 801 (D.Md. 1968) (bathing beach); United States by Clark v. Fraley, 282 F.Supp. 948 (M.D.N.C.1968) (tavern); and see the opinion of Chief Justice Warren in Drews v. Maryland, 381 U.S. 421, 428, note 10, 85 S.Ct. 1576, 14 L.Ed.2d 693

(1965) (amusement park). While 42 U.S.C. § 2000a(b) (4) has in most instances been applied to confer derivative coverage on recreational facilities, the legislative history makes it clear that retail stores with lunch counters[5] and medical facilities were also intended to be covered.[6]

■ 5. The right of Negroes to admission to Roper Hospital as patients and to equal employment opportunities is protected by 42 U.S.C. Sections 1981, 1982. See Jones v. Alfred H. Mayer Co., 392 U.S. 409, 88 S.Ct. 2186, 20 L.Ed.2d 1189 (1968); United States v. Beach Associates, Inc., 286 F.Supp. 801, 808 (D.Md.1968); Dobbins v. Local 212, International Bro. of Elec. Wkrs., 292 F. Supp. 413 (S.D.Ohio 1968).

■ 6. Since Roper Hospital has approximately 523 employees, it is an employer within the meaning of 42 U.S.C. § 2000e(b). Its operation affects commerce within the meaning of 42 U.S.C. § 2000e(h).

■ 7. A man is presumed to intend the probable consequences of his conduct. Radio Officers' Union etc. v. National Labor Relations Board, 347 U.S. 17, 74 S. Ct. 323, 98 L.Ed. 455, 41 A.L.R.2d 621 (1954). Where, as here, the defendants' course of conduct has predictably resulted in practically no Negroes being patients at Roper Hospital, this is sufficient to meet the requirements of 42 U.S.C. § 2000a–5(a).

■ 8. In cases of racial discrimination, this Court has not only the power but the duty both to enjoin future discrimination and, so far as possible, to eliminate the continuing effects of past discriminatory practices. Louisiana v. United States, 380 U.S. 145, 154, 85 S.Ct. 817, 13 L.Ed.2d 709 (1965); Quarles v. Philip Morris, Incorporated, 279 F.Supp.

---

5. Remarks of Congressman Celler, Hearings, House Comm. on Rules on H.R. 7152, 88th Cong., 2d Sess., p. 92 (1964); of Senator Magnuson, 110 Cong.Rec. 7406 (April 9, 1964), and of Congressman Willis, an opponent of the bill (House Hearings, p. 271).

6. See discussion between Congressmen Cramer and Poff, 110 Cong.Rec. 1969. An amendment to eliminate 201(b) (4) because it covered doctors and lawyers with offices in hotels was defeated. Cf. Pinkney v. Meloy, 241 F.Supp. 943 (N.D. Fla.1965).

505 (E.D.Va.1968); United States by Clark v. Local 189, United Papermakers & Paperworkers, 282 F.Supp. 39 (E.D. La.1968). In order to assure equal employment opportunities for all employees and applicants for employment in the future and the correction of past discrimination, the plaintiff is entitled to the relief provided for herein. See United States v. Southern Weaving Co., No. 68–10 (D.S.C. June 24, 1968).

Pursuant to the foregoing Findings of Fact and Conclusions of Law, it is hereby

Ordered, adjudged and decreed that the defendants, their employees, agents and successors and all persons acting in concert of participation with them, or with any of them,[7] are hereby permanently enjoined from discriminating against Negroes on account of their race in relation to their admission or treatment as patients at Roper Hospital and with respect to their employment at Roper Hospital. In furtherance of this prohibition against discrimination, and in order to correct the continuing effects of past practices, said defendants are more particularly ordered as follows:

## I

### ADMISSION AND TREATMENT OF PATIENTS

The defendants shall

1. Eliminate race or color as a factor in the admission, assignment, classification, transfer or treatment of patients at Roper Hospital.

2. Assign patients to floors, wings, wards, and rooms solely on the basis of age, sex, illness or other relevant factors without regard to race or color. In this connection, the defendants shall not ask any patient whether he or she would be willing to share a room with any other patient of a particular race or color or encourage the expression of such preference in room assignments based on race or color. Biracial occupancy of rooms and wards will not be changed or avoided except upon a written statement by the treating physician, provided upon an individual basis only, to the effect that there is a compelling medical request for a transfer in accommodations made at the patient's unsolicited request may be honored if the defendants have satisfied themselves that is made for non-racial reasons, e. g. the availability of previously requested but unavailable accommodations such as a single room, or the development of economic reasons not previously known to have existed. The defendants shall not solicit the use by physicians of such written statements or otherwise impede biracial occupancy of rooms and wards in the hospital, and will satisfy themselves that any written statement of a physician is made in good faith and upon an individual basis, so as to avoid any pattern of uniracial room occupancy.

3. Operate all programs conducted or sponsored by or affiliated with Roper Hospital without regard to race or color.

## II.

### ADOPTION AND IMPLEMENTATION OF OBJECTIVE EMPLOYMENT PRACTICES AND PROCEDURES

The defendants shall forthwith adopt and implement objective standards, practices and procedures with respect to the hiring, assignment, promotion and remuneration of employees and applications for employment (other than physicians seeking staff privileges, separately dealt with in paragraph 15 of this Order) as follows:

4. Within ninety (90) days from the entry of this Order, the defendants shall prepare and file with the Court and serve on counsel for plaintiff a document listing each job classification in the Hospital and containing, with respect to each such job classification, a brief description of the duties required to be performed, and the minimal qualifications required of an individual filling such job classification. The defendants shall further list the

---

7. For convenience the persons subject to this injunction are hereinafter collectively referred to as defendants.

minimum salary for each job classification and shall state and define grade or step promotions within each such job classification, together with the minimum requirements for grade or step promotions and salary pertaining to each step or grade. The defendants shall further describe the criteria upon which promotions are granted and shall identify the person or persons responsible for recommending and approving such promotions.

5. In order to insure that all applicants for employment are afforded equal consideration for any vacancy which may exist during the period of time when their applications are current, and that all similarly situated employees receive equal consideration for promotion and job assignment, one officer of the Hospital, to be selected by the Administrator of Roper Hospital or the Board of Trustees, shall be responsible for the selection of new employees and the filling of all vacancies, in consultation with the head of the department where such employee is to serve. All applications for employment at Roper Hospital shall be received and maintained in a single central location, and the appointed officer shall make his selection from among all applicants whose applications are current. All personnel records, including applications or copies thereof, will be maintained under the custody and supervision of the Hospital Personnel Officer. The Hospital Personnel Officer shall assist the appointed officer in such hiring to the extent deemed necessary or advisable in carrying out the purpose of this paragraph.

6. Each person seeking employment will be offered the opportunity to complete a form of application for employment. If the applicant requires assistance in completing the form, assistance shall be offered. The application shall be dated, either by the applicant or by an agent of the Hospital. In order that progress toward the achievement of equal employment opportunities may more easily be determined, a specific written designation of the race of each applicant shall be maintained by an agent of the Hospital. Each application form signed by an applicant will contain a conspicuous provision that such application will be considered current and will be eligible for consideration for a period of two months, and will receive no consideration thereafter unless renewed in writing by the applicant.

7. When a vacancy is to be filled by the employment of an individual not then in the employ of the Hospital, (i. e., a "new hire" or "re-hire",) the hiring officer will consider, in the order in which their applications were made, those persons whose applications are current, i. e., whose applications were made within the preceding two months, and he shall offer the opportunity to fill such vacancy to the best qualified applicant within such period who possesses not less than the minimal requisite qualifications as specified in paragraph 6 above. If any applicant considered fails, in the judgment of the hiring officer, to meet such minimal requisite qualifications for the position in question, or for all positions, a brief statement of the reasons therefor shall be recorded. If any applicant declines to accept the position offered, or if reasonable attempts to reach him are unsuccessful, this will be recorded and no further consideration shall be given to this applicant. If the first choice for any vacancy cannot be reached by telephone or otherwise as designated in the application within such reasonable time as may be necessary to fill such vacancy, this will be recorded and immediately thereafter effort may be made to contact, and to fill the position with, the second choice.

8. No applicant for employment will be given preference over any other applicant because of his relationship to or acquaintance with any employee or former employee of the Hospital. Previous satisfactory employment by the Hospital of an applicant may be considered in evaluating the qualifications of that applicant.

9. No person other than the hiring officer, or the Hospital Personnel Of-

ficer, will hire or offer employment to any individual, or promote any employee, or transfer any employee from one department to another, unless he has first received the written authorization of the hiring officer or the Hospital Personnel Officer.

10. In the event that a job at any level in any department becomes permanently vacant for any reason, the Hospital shall post a notice of vacancy on a conspicuous bulletin board in the department in which the job becomes vacant and on the bulletin board in the personnel office in the Hospital and shall allow seven (7) days for the present employees of the hospital to apply for the vacancy, in writing; provided that any temporary vacancy may be filled as may be deemed advisable or convenient for Hospital operation without formal change in job classification of such temporary job holder. A temporary vacancy in excess of thirty (30) days shall be filled in the same manner as a permanent vacancy. Such notice of vacancy shall include a description of the job available and the qualifications for employment in that position and shall state that the salary scale may be obtained from the Personnel Officer. Such notice shall include a statement as to how application to fill the vacancy shall be made.

In the event that the Hospital Personnel Officer certifies in writing that a vacancy exists which is required to be filled immediately, and in relation to which he has considered the qualifications of all current employees and has determined that no employee for whom filling such vacancy would be a promotion is qualified to fill such vacancy, the vacancy may be filled in accordance with the procedures for hiring prescribed in this Order.

11. Any solicitation or recruitment by the Hospital of applicants for employment will be made on a nondiscriminatory basis, except that, in order to implement the purposes of this Order and to correct the effects of the past, the defendants shall, within ten days, communicate to at least ten prominent Negro citizens of the Charleston area, including at least three Negro physicians, the substance of the compliance program contained herein. Any employment agency or service, to whom a request is made, shall be advised that the Hospital will hire without regard to race. In the event any recruiting is undertaken at high schools or other educational institutions, contact will be made with representative schools in the area which have a predominantly Negro student body as well as those which have a predominantly white student body. All advertisements for employees placed in any newspaper or other communications medium will conspicuously reflect defendants' nondiscriminatory policies.

12. Upon the expiration of the seven-day period of posting of the notice of vacancy, as prescribed in the preceding paragraphs of this Order, the defendants shall consider all applicants for the vacancy on the basis of the applicant's qualifications to perform the work required and his length of service at the hospital. In the absence of a substantial difference in qualification, the applicant with the greatest length of service at the Hospital shall be awarded the position.

13. In the event of there being no qualified applicant for any job posted, the defendants may treat the position as available for a new hire and proceed as prescribed in the pertinent paragraphs of this Order.

14. All applicants for employment shall be advised of all vacancies existing at the Hospital, and their preference with respect to assignment shall be given due consideration to the extent consistent with their qualifications. Where possible, applicants shall be assigned to such positions as to eliminate the racial identifiability of particular jobs as "white" or "Negro" jobs and to achieve so far as possible a fully integrated work force at the earliest practicable date.

15. All physicians seeking staff privileges, and prospective resident physicians and interns shall respectively be allowed staff privileges or be employed

by Roper Hospital on the basis of objective, non-racial criteria. No medical doctor seeking staff privileges or employment at Roper Hospital will be given preference over any other doctor because of his relationship to or acquaintance with any person connected with the Hospital, nor shall it be necessary for any physician seeking staff privileges prospective resident physician or prospective intern to obtain the recommendation of any person connected with the Hospital in order to have staff privileges at Roper or be employed by the Hospital. This provision in no way limits the Board of Directors of Roper Hospital from establishing medically recognized, objective, non-racial criteria to enable them to select physicians who are qualified to practice medicine at Roper Hospital, and it is not to be construed to require the defendants to lower the professional standards which have heretofore governed admission of doctors to the staff.

## DESEGREGATION OF FACILITIES

16. All of the facilities for employees in the Hospital, including, but not limited to, work areas, employee lounges, locker rooms, dressing rooms, bathrooms and toilets, shall be completely desegregated forthwith. No employee facility shall be assigned to or used exclusively or predominantly by members of one race. Lockers, both for employees already employed by the Hospital and for new employees, shall be assigned or reassigned on an alphabetical or other non-racial basis in an area convenient to their employment so as to assure fully integrated facilities. The fact that all of the employees in a particular line of employment are of one race shall not serve as a basis for the operation of uniracial facilities, and no employee facility shall be restricted to, designated for or used by persons engaged in any particular job category where such restriction, designation or use would result in complete or substantial racial segregation or separation in

the use of such facility; provided, however, that where requirements of sanitation make it necessary that hospital facilities be limited to persons who perform particular duties, e. g., doctors performing operations, the Hospital may limit the use of those facilities to those persons. The defendants shall include in their First Report pursuant to Paragraph 30 of this Order a detailed description of all steps taken by them to desegregate facilities, and shall further describe any exceptions based on sanitation requirements pursuant to this paragraph.

17. The defendants shall forthwith post the following signs on the two rooms on the ground floor near the x-ray desk: Out-Patient Waiting Room and X-Ray Waiting Room. All patients waiting for x-rays shall be directed to the x-ray waiting room. All out-patients shall be directed to the out-patient waiting room.

## THE LAUNDRY DEPARTMENT

18. The defendants shall take prompt affirmative steps to eliminate the racial identities of the jobs in the Laundry Department, and shall at the earliest practicable date assign Negroes to positions heretofore held by white persons and, so far as possible, assign white employees to positions heretofore held by Negroes.

19. The following Negro employees of the Laundry Department, each of whom has been employed in said Department for at least 10 years, shall be given preference, in order of length of service, over all other applicants for the next four vacancies in jobs in the Laundry Department heretofore held by white employees:

| Name | Length of Service |
|---|---|
| Daisy Robinson | 18 years |
| Rebecca Glover | 12 years |
| Johanna Stroud [8] | 11 years |
| Margaret Washington | 10½ years |

8. Subject to any limitations resulting from this applicant's physical impairment.

20. The pay rate of Negro employees in the Laundry Department shall be increased in accordance with the provisions of Appendix "D" of the Stipulation.

21. Lockers in the Laundry Department shall forthwith be assigned on an alphabetical or other non-racial basis, and all toilets and other facilities shall be completely desegregated in such a manner as to assure their biracial use.

22. No distinction based on race shall be permitted with respect to the requirement that employees punch time clocks in order to demonstrate attendance. No Negro employee of the Laundry Department shall be required to punch a time clock unless all white non-supervisory employees of that Department are required to do so.

## THE DIETARY DEPARTMENT

23. The defendants shall take prompt affirmative steps to eliminate the racial identities of the jobs in the Dietary Department, and shall, at the earliest practicable date, assign Negroes to positions heretofore held by white persons and, where possible, white employees to positions heretofore held by Negroes.

24. Provision shall be made for the transfer of Negro employees from service jobs in the Dietary Department to the position of Dietary Aide. All vacancies in the Dietary Aide category shall be filled by the most qualified persons employed in the Dietary Department.

25. The pay rates of two Negro employees of the Dietary Department shall be increased as provided by Appendix "C" of the Stipulation, in accordance with their qualifications for such increases.

## CLERICAL POSITIONS

26. Notwithstanding the provision of paragraph 7 of this Order, relating to the period for which applications shall be deemed current, the defendants shall, prior to filling any clerical position or position as ward secretary during the calendar year 1969, make reasonable efforts to contact each of the rejected Negro applicants listed in Appendix "E" to determine if they wish to be considered for such position, and if one or more of said persons does wish to be considered, the defendants shall treat her application as current and shall fill the vacancy with the best qualified applicant whose application is current, in accordance with the provisions of this Order.

## NURSE TECHNICIANS

27. Vacancies in the position of Nurse Technician shall, so far as possible, be filled in such a manner that each ward or area of the Hospital shall, at the earliest practicable date, have a biracial staff of nurse technicians. Subject to the purposes of this paragraph, the nonracial preferences of the nurse technician may be considered in determining assignment to a particular ward.

## NOTICE

28. In order to assure that Negro employees, as well as other employees, are promptly apprised of their rights, and in order to assure the orderly and efficient operation of the Hospital pursuant to the standards and procedures herein ordered, the defendants shall, within 20 days of the entry of this Order, furnish to all employees and all members of the medical staff a brief written explanation of the provisions of this Order, prepared in nontechnical terms understandable to those employees who have had limited educational opportunities. The explanation may, at the option of the defendants, be enclosed with the paychecks of the employees.

## REPORTING

29. For a period of two (2) years after the entry of this Order, the de-

fendants shall make reports to the plaintiff on the first day of January, April, July and October of each year, of their transactions concerning applicants for employment, persons employed, positions open and filled, and employees promoted, transferred, or receiving changes in wages, and reflecting the race of the persons concerned. In the event any applicant is rejected, the report shall summarize the reason or reasons for his rejection. These reports shall also disclose the number of white and Negro patients admitted during the period, and, with respect to each Negro patient admitted, the room to which he was assigned, whether it is a private or semi-private or a ward, and the race of other patients simultaneously assigned to the room or ward. These reports shall also state the name of any patient who transfers from biracial occupance in accordance with the provisions of this Order and the date and circumstances of such transaction. The form of the reports have been tentatively agreed upon by the parties.

30. All records made or kept pursuant to this Order or in the regular course of business and containing any information regarding any application for employment, or any individual who requests or is given a change of duties, job classification, wage scale, or other circumstances of employment, shall be maintained by the Hospital for not less than two (2) years, and shall be made available for inspection by the plaintiff at reasonable times and places upon request.

31. The defendants shall not discriminate or retaliate in any manner against any employee or applicant who has furnished information or participated in any respect in the investigation of the Hospital's employment practices in connection with this action.

32. Each party shall bear its own costs with respect to all matters predating the entry of the Order.