**UNITED STATES of America,**
**Plaintiff,**

v.

**REAL ESTATE DEVELOPMENT COR-**
**PORATION and Carl H. Leach,**
**Defendants.**

**No. EC 71-119-S.**

United States District Court,
N. D. Mississippi, E. D.

Aug. 28, 1972.

---

Carl W. Gabel, Donald J. Floyd, Housing Section, U. S. Department of Justice, Washington, D. C., H. M. Ray, U. S. Atty., Norman L. Gillespie, Asst. U. S. Atty., Oxford, Miss., for plaintiff.

James A. Dale, III, Columbus, Miss., for defendants.

ORMA R. SMITH, District Judge.

FINDINGS OF FACT

This action was instituted by the Attorney General on August 3, 1971, against the Real Estate Development Corporation and Carl H. Leach, alleging racially discriminatory housing practices at the Valencia and Holiday Apartments in Columbus, Mississippi, in violation of the Fair Housing Act of 1968, 42 U.S.C. § 3601 et seq. The complaint prays for injunctive and affirmative relief. In their answer defendants denied the material allegations of the complaint, and the case came to trial in Oxford, Mississippi on June 26, 1972. The Court, having considered the evidence and the contentions of counsel, now makes the following Findings of Fact and Conclusions of Law:

*The Defendants*

1. The defendant, Carl H. Leach, a resident of Columbus, Mississippi, owns and operates the Valencia and Holiday Apartments in Columbus, Mississippi. This property was owned by defendant Real Estate Development Corporation, before approximately December, 1971. This corporation was dissolved and the entire ownership of the apartments was transferred to Carl W. Leach.

2. The Holiday Apartments were constructed in 1966 and the Valencia Apartments were constructed in 1965. They have been operated by Mr. Leach, who at various times owned and operated other apartment units. None of the apartments which he has owned or operated has ever been rented to a Negro.

3. There are Negroes living within a four or five block radius of Holiday Apartments and within a five to ten block radius of the Valencia Apartments. According to the 1970 census, the population of Columbus, Mississippi, was 25,795, of whom 9,721, or 37.6% are black.

4. Acceptance or rejection of applicants to defendants' apartments is completely arbitrary and subjective. Defendants have not used formal application forms, nor do they make credit or background checks of applicants. There are no set standards for prospective tenants as to income, credit, age, education, or marital or family status.

5. The defendants have operated the Valencia and Holiday Apartments in a racially discriminatory manner. The uncontradicted testimony shows that black applicants have been rejected by agents of defendants on account of race, and that the defendant Leach has made a number of extrajudicial admissions of a racially discriminatory policy. Moreover, defendants' policy prior to the effective date of the Fair Housing Act of 1968 was openly discriminatory, and defendants took no steps at all, either adequate or inadequate, to change that policy.

6. Mrs. Clara Frances Jenkins was employed by Mr. Leach as office manager from January 13, 1969, to August 3, 1970. Mrs. Jenkins testified that she

rented apartments to applicants, based on instructions from Mr. Leach. She estimated that, while she was the manager, there were approximately three black applicants for apartments a week. The blacks were turned away and told there were no vacancies even though vacant apartments, suitable to their needs were available.

7. Mrs. Jenkins acknowledged that she was convicted of embezzlement from Mr. Leach and she received a five-year suspended sentence and a fine of $250.-00. She admitted to some animosity against Leach. The Court recognizes that her credibility would ordinarily be somewhat suspect. Since her testimony is entirely consistent with the evidence of Mr. Leach's policy described in the following Findings, the Court believes that measurable number of blacks were turned away on account of race during her year and a half in Mr. Leach's employment.

8. Mrs. Vonda Hoskins was employed as the manager for defendant Leach from November 1966 to January 14, 1969. She acted as agent for Mr. Leach in renting the apartments and rented the apartments in accordance with the general instructions provided by Mr. Leach. She and Mr. Leach were aware of the passage of the 1968 Fair Housing Act and they discussed the Act shortly after it passed. Prior to its passage, she would not rent apartments to Negroes. Subsequent to the conversation about the 1968 Act with Mr. Leach, Mrs. Hoskins was not aware of any change in Mr. Leach's rental policies. She did not rent to blacks before the passage of the Fair Housing Act nor did she rent to blacks after passage of the Act, although she testified that she would have done so had a black applicant applied during the first two weeks of 1969.

9. On November 10, 1969, ten months after the effective date of the Fair Housing Act, representatives of the United States Air Force sent a letter to Mr. Carl Leach, in care of the Valencia and Holiday Apartments, in Columbus, Mississippi. In this letter, it was explained to Mr. Leach that it was the program of the Air Force to achieve equal housing opportunity for members of the Armed Forces without discrimination based on race or color. The letter related that it is unlawful for a landlord to discriminate against any serviceman because of his color, that the two apartment buildings were not listed with the Housing Referral Office as being in compliance with the required open housing policy, and that the Air Force records did not indicate that an open housing policy has been adopted at the named apartments.

10. Mr. Filyaw, formerly a Columbus Air Force Base Housing Referral Official, contacted defendant Leach in December 1970, to determine if there had been a change in Mr. Leach's policy with regard to the rental of apartments to Negroes. That policy was related in Air Force records to be one of noncompliance. Mr. Leach did not give Filyaw any assurance that he would comply with the Department of Defense open housing policy. He also informed Mr. Filyaw, that he (Leach) was aware that people he knew had signed the open housing agreement and would not rent to blacks. Mr. Leach described these people as hypocrites. Mr. Leach further told Mr. Filyaw that he would not comply with anything and there was no sense in us contacting his office further. In context, Mr. Leach's statements to Mr. Filyaw were an admission of a discriminatory policy.

11. Lynn P. Smith, who is a Special Agent with the Federal Bureau of Investigation, contacted Mr. Leach in June 1971, during an investigation of a complaint that Mr. Leach had not signed an open housing agreement with the United States Air Force Base at Columbus. Mr. Leach informed Mr. Smith that he had told officers of the Air Force that it was not his (Leach's) policy to sign any agreement. Mr. Smith further testified that Mr. Leach said he was going to liquidate his holdings prior to trial. Mr. Leach declined Agent Smith's offer

to be advised about the Fair Housing Act and said he did not desire to know it. The defendant's lack of desire to know about the Fair Housing Act is particularly significant since he told Mr. Filyaw that he "rented to whom he chose and that was it". While Mr. Leach's representations to Mr. Smith, standing alone, do not establish a post-Act discriminatory policy, they do not indicate any changes from a pre-Act discriminatory policy, which the evidence reflects had been in effect in Mr. Leach's rental units.

12. Sgt. Claude Nelson who became the Base Housing Official at Columbus Air Force Base, subsequent to Mr. Filyaw, was responsible for the locating of off-base housing for servicemen on a nondiscriminatory basis. He contacted Mr. Leach on July 6, 1971 to attempt to obtain the listing of his apartments with Columbus Air Force Off-Base Housing Office. Sgt. Nelson asked Mr. Leach for an assurance that he would rent apartments to anyone on equal basis. Mr. Leach declined to assure Sgt. Nelson that he would comply with the Department of Defense Open Housing Policy.

13. On September 7, 1971, Sgt. Nelson, upon determining that Mr. Leach owned an apartment complex on Old Aberdeen Road, Columbus, Mississippi, caused a letter to be sent by representatives of the Air Force to Mr. Leach, soliciting Mr. Leach's assurances that those apartments would be made available to all members of the military without regard to race. Enclosed was a new Family Information Housing sheet. This letter was received by Leach. No response was received by the Air Force.

14. Mr. Leach's representations and conduct vis-a-vis Sgt. Nelson, standing alone, do not constitute explicit admissions of a discriminatory policy, although the refusal to provide an assurance points in that direction. Taken together with what had occurred before, however, they indicated that the prior policy, which was discriminatory, remained unchanged. As a result of Mr. Leach's failure to provide nondiscrimi-

nation assurances, the apartments under his control remain off limits for military servicemen, and his conduct has resulted in the elimination of a source of applicants (military personnel) of whom blacks comprise a significant proportion.

15. Defendant Leach did not attend the trial. During closing argument, counsel for the defendant was unable, in response to a specific question from the bench, to advise the Court that, at that time, his client would rent apartments to black applicants on a nondiscriminatory basis. The Court finds, therefore, that the defendant has failed to provide any assurance that his prior discriminatory policy has changed; absent an injunction, there is no reason to believe that black men could rent an apartment from defendant today.

CONCLUSIONS OF LAW

1. This court has jurisdiction of this action under 28 U.S.C. § 1345 and 42 U.S.C. § 3613.

2. The Holiday and Valencia Apartments are "dwellings" within the meaning of 42 U.S.C. § 3602(b).

3. Title VIII of the Civil Rights Act of 1968 (42 U.S.C. § 3601 et seq.) is an appropriate and constitutionally permissible exercise of Congressional power under the Thirteenth Amendment to bar all racial discrimination, private as well as public, in the sale and rental of real property. United States v. Hunter, 459 F.2d 205, 1972 (4th Cir. 1972) aff'd, 324 F.Supp. 529 (D.Md. 1971); Brown v. State Realty, 304 F. Supp. 1236 (N.D.Ga.1969); United States v. Mintzes, 304 F.Supp. 1305 (D. Md.1969).

4. The Congressional intent in enacting Title VIII is stated in 42 U.S. C. § 3601 as follows: "It is the policy of the United States to provide, within constitutional limitations, for fair housing throughout the United States." Like other civil rights statutes, it is to be accorded a broad construction in accordance with the foregoing purpose. Sullivan v. Little Hunting Park, 396 U.S.

229, 90 S.Ct. 400, 24 L.Ed.2d 386 (1969).

5. In weighing the evidence in this case, the court recognizes that the law prohibits "sophisticated as well as simple-minded modes of discrimination." Lane v. Wilson, 307 U.S. 268 at 275, 59 S.Ct. 872 at 876, 83 L.Ed. 1281 (1939); Gaston County v. United States, 288 F. Supp. 678 (D.D.C.1968), aff'd, 395 U.S. 285, 89 S.Ct. 1720, 23 L.Ed.2d 309 (1969).

6. Courts look to substance rather than to the form of transactions, United States v. Beach Associates, Inc., 286 F.Supp. 801 (D.Md.1968), and may find racial discrimination, although the ostensible purpose was nonracial. United States v. West Peachtree Tenth Corp., 437 F.2d 221 (5th Cir. 1971). United States v. Reddoch (No. 6541–71 P, S.D.Ala. January 27, 1972), at 22.

7. Practices with discriminatory consequences are prohibited, irrespective of the defendant's motivation. Griggs v. Duke Power Co., 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971). Even if Mr. Leach believed he had a right to do as he did—and there is no evidence that he so believed—"it is of no consolation to an individual denied [equal housing opportunity] that it was done in good faith." Burton v. Wilmington Parking Authority, 365 U.S. 715, at 725, 81 S.Ct. 856, at 861, 6 L. Ed.2d 45 (1961).

8. As the court said in United States v. Reddoch, supra, at 22–23, another apartment discrimination case, "in cases of racial discrimination, statistics often tell much and courts listen." State of Alabama v. United States, 304 F.2d 583 (5th Cir. 1962) aff'd, 371 U.S. 37, 83 S.Ct. 145, 9 L.Ed.2d 112 (1962). "Nothing is as emphatic as zero." United States v. Hinds County Board of Education, 417 F.2d 852 at 858 (5th Cir. 1969). In the present case, the Valencia and Holiday Apartments have been in operation since 1965 and 1966 respectively, and neither has ever had a black tenant. This evidence constitutes, at least, a prima facie case of racial discrimination, casting a burden upon the defendant to come forward with evidence to the contrary. Parham v. Southwestern Bell Telephone Co., 433 F. 2d 421 at 426 (8th Cir. 1970); Jones v. Lee Way Motor Freight, Inc., 431 F.2d 245 at 247, 248 (10th Cir. 1970). In this case, the facts are even more extreme than in Parham, in which the court held that the statistical evidence established discrimination as a matter of law, but, unlike the situation in Parham, the defendant has provided no explanation at all.

9. The legal effect of the foregoing statistical evidence is reinforced by the complete "absence of objective criteria applied to all [applicants] alike," for this "[i]ndicate[s] that race is the only identifiable factor explaining the [lack of black tenants]." Brown v. Gaston County Dyeing Mach. Co., 457 F.2d 1377 at 1383 (4th Cir. 1972) (employment).

10. By his various extrajudicial statements and hints to federal representatives that he would not rent to blacks, and by his other conduct, Mr. Leach created, cultivated, and perpetuated an all-white, discriminatory image and failed to take any steps whatever to mitigate it. Such conduct is discriminatory and prohibited. United States v. Central Motor Lines, 338 F.Supp. 532, at 558, 559 (W.D.N.C.1971), United States v. United Assn. of Journeymen, etc., Plumbers Local Union No. 73, 314 F. Supp. 160 at 161–163 (S.D.Ind.1969); United States v. Medical Society of South Carolina, 298 F.Supp. 145 at 148 (D.S.C.1969). Absence of Negro tenants, under such circumstances, is no indication of lack of interest. " . . . but indicates, [we think,] a sense of the futility of such an effort in the face of the notorious discriminatory policy . . . . " This is attributable to the defendant's racial policy. Cypress v. Newport News General & Nonsectarian Hospital, 375 F.2d 648 at 653 (4th Cir. 1967); United States v. United Assn. of Journeymen, etc., Plumbers Local Union No. 73, supra.

**11.** In United States v. Medical Society of South Carolina, *supra,* involving discriminatory admission practices of a hospital, the defendants refused to agree to sign the necessary assurances, with representatives of the Department of Health, Education and Welfare, making them eligible for federal financial assistance. This was reported in the press, and, as a result, the defendants' general image was discriminatory. Even though defendants had no legal obligation to sign the assurances, the image so fostered, which defendants did nothing to offset, was held to sustain a finding of pattern or practice, although there were few, if any, post-Act applicants. While the defendant in this case has no legal obligation to sign a nondiscrimination agreement with the Air Force, his failure to do so under the circumstances of this case, even apart from the overt discriminatory acts and admissions, has the same consequence as the conduct found unlawful in Medical Society.

**12.** The Court recognizes that "most persons will not admit publicly that they entertain any bias or prejudice against members of the Negro Race." Dailey v. City of Lawton, 296 F.Supp. 266 at 268 (W.D.Okla.1969) aff'd, 425 F.2d 1037 (10th Cir. 1970); United States v. Reddoch, supra. Under these circumstances, statements which come close to admissions of a discriminatory policy, especially when bolstered by explicit admissions, are persuasive evidence of discrimination.

13. To prevail in this case[1] under the provisions of 42 U.S.C. § 3613, the Attorney General must show either:

(a) a pattern or practice of resistance to the enjoyment of the right to equal housing opportunity; or

(b) a denial of such rights to a group of persons, as to which denial the Attorney General has made a de-termination of general public importance.

**14.** "The words 'pattern and practice' are not terms of art, but have their generic meaning. It is incumbent upon the government to show that any discriminatory act by the defendant was not an isolated, accidental or peculiar departure from a nondiscriminatory norm." United States v. Reddoch, *supra,* at 25–26. The number of Negroes rejected is not determinative of the presence of such a pattern or practice. United States v. Ramsey, 331 F. 2d 824 at 837, 838, n. 19 and n. 20 (on rehearing) (5th Cir. 1964); United States v. Mayton, 335 F.2d 153, at 158, 159, (5th Cir. 1964); United States v. Mintzes, *supra,* at 1313, 1334. United States v. West Peachtree Tenth Corp., *supra.* In United States v. Alexander and Cloutier Realty Co. (No. 13805, unpublished order of Nov. 3, 1970) (N.D.Ga.), the Court found a pattern or practice on the basis of a single refusal of a dwelling to a Negro and an extrajudicial admission of a racially discriminatory policy to which that refusal conformed. "No minimum number of incidents is required, nor was such a minimum intended." United States v. West Peachtree Tenth Corp., *supra*; United States v. Reddoch, *supra,* at pages 25–26. That the identities of the applicants rejected by defendants, see *Finding 6 supra,* is unknown, is immaterial; proof of a discriminatory policy is often made by incidents concerning persons whose race is known, but whose name is not. United States v. Reddoch, *supra*; United States v. Northside Realty Associates, 324 F.Supp. 287 (N.D.Ga.1971) (the Detroit professor incident).

**15.** While it is not necessary, in order to prove a pattern or practice of racial discrimination, to show that defendants uniformly engage in unlawful conduct, United States v. Ironworkers

---

[1]. The United States has not alleged here a "group pattern or practice," in which discrimination by the defendant and others cumulatively have the impact of a "pattern or practice." Cf. United States v. Mitchell, 335 F.Supp. 1004 (N.D.Ga. 1971).

Local 86, 443 F.2d 544, at 552 (9th Cir. 1971), the evidence in the instant case is compelling that the policy of defendant Carl Leach, from the dates that each of his apartment buildings were opened for rental, to the present, has been to reject blacks as tenants because of their race.

16. Evidence tending to show that the defendants engaged in racial discrimination prior to the effective date of the Act is relevant to show that the plaintiff is entitled to present relief. This is true even though nothing in the discriminatory pre-Act policies of the defendants, except their discriminatory image, has created structural impediments to the present implementation of a nondiscriminatory policy. In housing cases, proof of a pre-Act policy of discrimination and a showing that there is no evidence of a change in policy after the effective date of the Act, creates a strong inference that the pre-Act policy was continued. United States v. West Peachtree Tenth Corp., *supra*, at 227; United States v. Northside Realty Associates, *supra*; United States v. Sheet Metal Workers et al., 416 F.2d 123, at 127 (8th Cir. 1969).

17. The failure of defendant Leach affirmatively to make his resident managers aware of any change in his rental policies with respect to renting to blacks after passage of the 1968 Fair Housing Act, constitutes a discriminatory course of conduct, for the natural consequence is that discrimination will continue. This satisfies the pattern or practice requirements of 42 U.S.C. § 3613. The absence of persuasive indications that a cessation of an admitted pre-Act pattern or practice has occurred is evidence of a pattern or practice of discrimination subsequent to the passage of the Act. Cf. United States v. West Peachtree Tenth Corp., *supra*; United States v. Medical Society of South Carolina, *supra*.

18. The "second alternative" of 42 U.S.C. § 3613 authorizes injunctive relief in favor of the government where there has been a denial of rights granted by the Act to any group of persons and where the Attorney General had determined [2] that such denial raises an issue of general public importance. United States v. Reddoch, *supra*. As the Court said in United States v. Hunter, *supra*, 459 F.2d at 218, n. 17:

> In contrast to the 1964 Act, a pattern or practice of resistance is not an indispensable prerequisite for relief. Relief may be based on a single (unintentional) violation of the Act when by that violation a group of persons are denied their statutory rights and the case raises an issue of general public importance. Here the rights of all nonwhites looking for an apartment were abridged by the [two] illegal advertisements published in *The Courier*.

19. In United States v. Reddoch, *supra*, slip opinion at 27, the Court said:

> To determine whether an injunction is appropriate under the "second alternative" of 42 U.S.C. § 3613, the court will apply conventional principles of equity. Injunctive relief is appropriate, in cases of this kind, where significant violations of the Act have been shown, irreparable injury being presumed from the fact of such violations, without more. United States v. Hayes International Corp., 415 F.2d 1038 (5th Cir. 1969). Since equity looks to the future, injunctive relief is also appropriate, even in the absence of a showing of past violations, where the defendants' conduct or statements threaten future violations. Swift & Co. v. United States, 276 U.S. 311, 326 [, 48 S.Ct. 311, 2 L.Ed. 587] (1928); United States v. W. T. Grant & Co.,

2. As indicated in Reddoch, the Attorney General's determination of general public importance is not reviewable. See United States v. Mitchell, 313 F.Supp. 299 (N.D.Ga.1970); United States v.

Greenwood Municipal Separate School District, 406 F.2d 1086 (5th Cir. 1970) (determination that suit will promote orderly school desegregation).

345 U.S. 629, 633 [, 73 S.Ct. 894, 97 L.Ed. 1303] (1953).

Injunctive relief is appropriate in this case on the basis of defendants' discriminatory rejection of blacks, standing alone, and on the basis of their extrajudicial admissions of a discriminatory policy. The need for such relief is even more cogent when both of these kinds of evidence are considered together. United States v. Reddoch, *supra*, slip opinion at 27.

20. The group of persons whose rights were denied for purposes of the "second alternative" of 42 U.S.C. § 3613 include not only the blacks as to whose rejection Mrs. Hoskins testified, but also all those who did not come to apply to the apartments as a result of Mr. Leach's conduct and the apartments' all-white image. See United States v. Hunter, *supra*, 459 F.2d 205 n. 17.

21. The resident managers and managers of the defendants, as agents of the defendants, are authorized to represent the defendants and can rent in no other capacity. Their acts and statements, made within the scope of their agency, are attributable to the defendants, whose duty to comply with the law is non-delegable. United States v. Reddoch, *supra*, slip opinion at 28; Williamson v. Hampton Mgmt. Co., 339 F. Supp. 1146 (N.D.Ill.1972).

22. The defendant Leach did not appear at the trial. Defendants conducted little cross-examination of plaintiff's witnesses and put on no defense of their own. In United States v. Mintzes, *supra*, at 1314, the Court, in finding a pattern or practice of "blockbusting" on the basis of unlawful representations to three persons, said:

Neither of the defendants took the stand to deny the statements or to testify to their general practice. This did not change the burden of proof on the government, but it permits the Court to draw inferences which defendants' testimony might have prevented.

23. In cases of this kind, injunctions should not be granted grudgingly and their scope should be sufficiently broad to assure nondiscrimination. Hodgson v. First Federal Savings & Loan Assn., 455 F.2d 818 (5th Cir. 1972) (age discrimination in employment). In United States v. West Peachtree Tenth Corp., *supra*, at 229 et seq., a case involving racial discrimination at an apartment house comparable to the Holiday and Valencia Apartments, the Court of Appeals for this Circuit directed the entry by the District Court of a specific prescribed decree, which was obviously designed to be a model [3] for District Courts, to follow in comparable cases. Accordingly, the Court has drawn heavily on the *Peachtree* decree.

The Court will enter the appropriate order and injunction in this action to carry into effect the court's findings as hereinbefore set forth.

3. In United States v. Hunter, supra, 459 F.2d 205, the West Peachtree order is explicitly described as a "model decree."

See also United States v. Reddoch, supra, slip opinion at p. 29 et seq.